**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**, | : | **CRIMINAL NO. 21-CR-597 (BAH)** |
| | : | |
| v. | : | |
| | : | |
| **JAVIER ALGREDO VAZQUEZ**, | : | |
| **also known as "Men,"** | : | |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S MOTION *IN LIMINE***
**TO INTRODUCE AND AUTHENTICATE EVIDENCE**

The United States Government, by and through undersigned counsel, respectfully moves to admit and authenticate evidence of the drug conspiracy charged in this case. Specifically, the Government seeks to introduce: 1) shipping documents related to chemicals known to be used to produce synthetic drugs, including methamphetamine, purchased during the charged conspiracy; and 2) evidence of uncharged crimes, including the seizure of chemicals after indictment and evidence of the distribution of chemicals used to manufacture fentanyl, phenylcyclohexyl piperidine (PCP), and cocaine by Defendant Javier Algredo Vazquez (the "Defendant") and his coconspirators. The proffered evidence is admissible as direct or "intrinsic" evidence, and some categories are alternatively admissible as other "crime, wrong, or act" evidence under the Federal Rule of Evidence ("FRE") 404(b). The Government also seeks to authenticate electronic mail evidence using certifications of custodians of record pursuant to FRE 902(13). For reasons discussed below, the Court should grant the motion.

**I.   BACKGROUND**

On September 23, 2021, a grand jury sitting in this District returned a three-count indictment charging the Defendant with conspiracy to manufacture and distribute methamphetamine for unlawful importation into the United States, in violation of 21 U.S.C.

§§ 959(a), 960, and 963 (Count One), conspiracy to distribute a listed chemical knowing and intending that it would be used to manufacture methamphetamine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(b), 960, and 963 (Count Two), and conspiracy to launder narcotics proceeds, in violation of 18 U.S.C. § 1956 (Count Three). Dkt. No. 8. The indictment alleges that the conspiracies[1] described in Count One and Count Two began in or around 2011, the money laundering conspiracy in Count Three began in or around 2018, and both conspiracies continued through the date of the indictment.

The indictment arose out of U.S. law enforcement's decade-long investigation into one of the most brutal and prolific Mexican cartels, the Cartel de Jalisco Nueva Generacion ("CJNG"). U.S. law enforcement authorities identified the Defendant as a chemical supplier for Mexican cartels' drug production operations. The investigation showed that the Defendant and his coconspirators, including his brother, Carlos Algredo Vazquez ("Carlos"), used seemingly legitimate chemical importation companies to purchase chemicals in multi-tonnage quantities from foreign chemical sellers, primarily in India and China. Upon receiving the purchase orders, the foreign chemical sellers would contract maritime shipping carriers to load the purchased chemicals at ports of origin onto cargo ships and deliver the chemicals to Mexican ports. From there, the Defendant and/or his coconspirators would arrange for further distribution of the chemicals to drug cartels within Mexico, including CJNG, at times retaining portions of the chemicals for their own use.

Over the years, U.S. and Mexican law enforcement authorities have seized multiple bulk shipments of chemicals associated with the Defendant and/or his coconspirators.[2] Documents

---

[1] Counts One and Two are hereinafter referred to as "the charged drug conspiracy."

[2] Though parallel, the Mexican investigations at issue are independent and separate from their U.S. counterparts.

related to the purchase and shipment of the seized chemicals list details of the orders, including the suppliers, chemicals purchased, consignee companies, and notify parties. The Government has obtained official copies of pertinent evidence obtained by Mexican law enforcement authorities, including evidence of the Mexican chemical seizures, through mutual legal assistance treaty ("MLAT") requests. The Government also has subpoenaed third-party service providers for email records and bank records related to the Defendant and his coconspirators.

The Defendant was arrested in the District of Columbia on September 20, 2021, while attempting to recover some of the seized chemicals from U.S. law enforcement's custody. His trial is scheduled for July 17, 2023.

## II.   METHAMPHETAMINE PRECURSOR CHEMICALS PURCHASED AND SEIZED DURING THE CHARGED CONSPIRACY

At trial, the Government intends to introduce documentary evidence of four bulk shipments of chemicals that can be used to manufacture methamphetamine that were seized by U.S. law enforcement authorities during the time period charged in the indictment. The documents, in addition to other evidence, will link the seized chemicals—known to be used to manufacture methamphetamine—to the Defendant and the charged conspiracy. Additionally, the Government intends to introduce the same type of shipping records for chemical shipments that were not seized by U.S. law enforcement but correspond with transactions in the Defendant's emails, banking records, and other communications.

The shipping documents include: 1) cargo manifests, *i.e.*, documents that commercial freight carriers issue, providing details on the cargo, the cargo's quality or conditions, and the vessels that transport the cargo from its place of origin to its destination; 2) bills of lading, *i.e.*, contract documents that freight carriers issue, providing legal title of the cargo to the purchaser

3

(also with details about the cargo);[3] and 3) invoices, *i.e.*, documents that foreign chemical sellers issue, providing details on the chemicals and consignees, notifying parties, and/or purchasers. The shipping documents the Government intends to introduce list the Defendant's U.S.-based company, Pro Chemie New York Inc. ("Pro Chemie"), or Carlos's Mexico-based company, MB Barter & Trading Mexico SA DE CV ("MB Barter"), as the consignee and/or notify party for the shipments.

The bills of lading and cargo manifests are authenticated by certifications provided by the shipping companies that produced the shipping records pursuant to FRE 902(11), attached hereto as Exhibit 1, and the records are admissible as business records under FRE 803(6). Additionally, the shipping records, including the invoices, fall within the exception to the rule against hearsay for documents affecting property interest, FRE 803(15). Therefore, the documents are admissible as direct evidence of the charged offenses.

A. **Background**

Since at least the inception of the charged drug conspiracy, the Defendant and his coconspirators have supplied Mexican cartels with chemicals used in the manufacture of synthetic drugs, including methamphetamine. To support this criminal undertaking, the Defendant and his coconspirators registered chemical importation companies to purchase the chemicals, including Pro Chemie and MB Barter. These companies were consignees and/or notify parties on the purchase and shipping documents for the chemicals that the Defendant and his coconspirators

---

[3] Bills of lading also serve as shipment receipts for chemical sellers/shippers and may contain insurance provisions. *See* 46 U.S.C. § 30703 (noting a bill of lading "is prima facie evidence of receipt [by a carrier] of the goods described" therein); *see also Georgia-Pac. Corp. v. M/V ANTHOS*, 106 F.3d 398 (5th Cir. 1997) (discussing significance of bills of lading for liability purposes, including establishing a "prima facie evidence that the carrier received the cargo in good condition").

purchased.  The chemicals were then transported on cargo ships to Mexican ports, which would often require weeks or months for delivery from their origin, generally in India or China.

The following table lists chemicals used in the manufacture of methamphetamine that the Defendant and/or his coconspirators purchased but did not receive because the U.S. Government seized them during the charged conspiracy:[4]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TABLE A** | | | | | | | |
| | **Date of Seizure** | **Place of Seizure** | **Chemical** | **Quantity** | **Origin** | **Destination** | **Consignee or Notify Party** |
| 1 | 6/8/2021 | Oakland, CA | Methylamine Hydrochloride | 24,500 kg | China | Manzanillo, Mexico | MB Barter[5] |
| 2 | 8/25/2021 | Houston, TX | Citric Acid | 25,100 kg | China | Veracruz, Mexico | MB Barter |
| 3 | 8/30/2021 | Houston, TX | Citric Acid | 25,100 kg | China | Veracruz, Mexico | MB Barter |
| 4 | 9/21/2021 | Miami, FL | Acetic Acid | 44,400 kg | Turkey | Manzanillo, Mexico | MB Barter |

The Defendant's bank records and emails document additional purchases by Pro Chemie and MB Barter of chemicals used in the manufacture of methamphetamine during the charged drug and money laundering conspiracies.  For example, bank records show that, on February 2, 2021, Pro Chemie wired $12,360 to Jinan Qinmu Fine Chemical Co.'s bank account in China.  The wire remarks read "PAY INVOICE EXAX21002 POP GOODSCONT ANDREA AN."  The corresponding invoice obtained by Homeland Security Investigations ("HSI") was for a shipment of approximately 23,500 kilograms of benzyl alcohol, which is a chemical used to manufacture

---

[4] The Government intends to introduce evidence of three additional chemical seizures, as discussed in Section III below: two post-indictment U.S. seizures and one seizure by Mexican law enforcement authorities.
[5] The bill of lading for the June 8, 2021 seizure lists Jose Alberto Salinas Vazquez as the consignee, but the email address listed for the consignee belongs to Carlos.  Additionally, the corresponding invoice lists MB Barter as the consignee.

methamphetamine.  According to the invoice, Pro Chemie was the buyer, MB Barter was the consignee and notify party, and the shipment was being sent to Manzanillo, Mexico.

HSI obtained the bills of lading and cargo manifests associated with the chemicals seized by U.S. law enforcement as part of a routine procedure for any commercial vessel making entry at a U.S. port, which includes "[a]ny vessel from a foreign port or place."  19 C.F.R. § 4.3.  Such a commercial vessel is required to produce their cargo manifests and bills of lading to U.S. Customs and Border Protection ("CBP") upon request.  19 C.F.R. §§ 4.2(a), 4.7(a), 4.7a.  HSI obtained bills of lading and cargo manifests for historical shipments from law enforcement and commercial databases that aggregate international customs information.  The invoices were obtained pursuant to HSI's border search authority.  Hard copies of the invoices were sent by the supplier via mail/shipping carrier and transited the U.S. en route to the purchaser in Mexico.[6]  Together, the shipping documents chronical the Defendant and his coconspirators' purchase—through their respective chemical importation companies—of chemicals used to produce methamphetamine, and their ownership of the same.

### B. __Legal standard__

Evidence that is part of or closely related to a charged conspiracy is admissible as direct or intrinsic evidence.  *See, e.g.*, *United States v. Lorenzana-Cordon*, 141 F. Supp. 3d 35, 38-40 (D.D.C. 2015) (discussing D.C. Circuit's legal standard for admission of direct evidence).  Even direct evidence must comply with the rules of admissibility, including the rules governing hearsay.  FRE 803(6) excepts from the rule against hearsay "[a] record of an act, event, condition, opinion, or diagnosis if":

---

[6] The Government intends to call an HSI agent involved in the acquisition of the bills of lading, cargo manifests, and invoices as a trial witness.

(A)    the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B)    the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)    making the record was a regular practice of that activity;

(D)    all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)    the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  Additionally, FRE 803(15) provides: "A statement contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose" is excepted from the rule against hearsay, "unless later dealings with the property are inconsistent with the truth of the statement or the purport of the document."  Fed. R. Evid. 803(15).

Courts have admitted shipping documents, including bills of lading and invoices, under FRE 803(6)'s business records exception, among others.[78]  *See, e.g.*, *United States v. Reese*, 561 F.2d 894, 904 (D.C. Cir. 1977) (noting case where invoices "received through regular business channels and maintained by witness in regular course of shipper's business" were held to be properly admitted, "even though [the] only testimony as to the documents' reliability was offered

---

[7] *See also United States v. Pfeiffer*, 539 F.2d 668, 671 (8th Cir. 1976) (affirming admission of bills of lading under FRE 803(6) and noting a trial court's discretion to admit such documents under the residual category of FRE 807 if the documents are "otherwise [ ] trustworthy"); *United States v. Bachsian*, 4 F.3d 796, 798 (9th Cir. 1993) (affirming admission of "certain shipping documents, [including] two ocean bills of lading, two packing lists, and two commercial invoices" under FRE 807).

[8] This motion provides formal notice, pursuant to FRE 807, of Government's intent to introduce the documents at trial.

by the recipient of the documents, rather than by their preparer" because "the serial numbers on the [delivery] receipt corresponded to those on shipper's bill of lading"); *United States v. Collado*, 439 F. App'x 845, 847-48 (11th Cir. 2011) (affirming bills of lading admission under FRE 803(6) because "the documents were kept in the ordinary course of business, and were prepared as a regular business practice and soon after the [purchase] orders were transmitted to the shipping companies"); *Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 819 (9th Cir. 2002) (affirming admission of bills of lading as business records under FRE 803(6) because "the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded," and "the record is kept in the course of regularly conducted business activity"); *Southco, Inc. v. Fivetech Tech. Inc.*, 982 F. Supp. 2d 507, 515 (E.D. Pa. 2013) (admitting bills of lading under FRE 803(6); collecting cases).

## C. Analysis

Here, documents related to the purchase and shipping of chemicals during the charged conspiracy, including invoices, bills of lading, and cargo manifests, are admissible direct evidence because they relate to "act[s] that [are] part of the charged offense." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). The documents establish that Defendant and his coconspirators used their own chemical importation companies to purchase chemicals known to be used to manufacture methamphetamine from foreign companies and had the chemicals shipped to Mexico. The Government anticipates cooperating witnesses ("CWs") will testify that once delivered in Mexico, the Defendant and/or his coconspirators further distributed the chemicals to Mexican cartels and used some of the chemicals in their own methamphetamine labs.

The bills of lading and cargo manifests are properly authenticated by FRE 902(11) certificates from the shipping companies and are exempt from the rule against hearsay because

they are business records, admissible under FRE 803(6).  All shipping records at issue are documents that foreign chemical sellers and freight shipping companies regularly issue to document "regularly conducted activity of [their] business." Fed. R. Evid. 803(6); *see, e.g.*, *United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007), *as amended* (Feb. 13, 2008) (noting admission of bills of lading under the business records exception); *Collado*, 439 F. App'x at 847 (affirming admission of purchase and shipping documents as business records).  The bills of lading and cargo manifests are business records of the shippers, who have a heightened interest in the accuracy and completeness of the documents, both because of the pecuniary liabilities that would result from any errors or inconsistencies and also because the documents are subject to inspection by Customs authorities.

Moreover, the documents are excepted from the rule against hearsay because they contain statements that "establish or affect an interest in property," the statements are "relevant to the document[s'] purpose," and no "later dealings with the property [were] inconsistent with the truth of the statement[s]." Fed. Evid. R. 803(15).  The purchase and shipping documents establish ownership interest.  Chemical importation companies, which are the purchasers, rely on the certificates and records that chemical sellers and shipping companies issue to establish ownership of the products that the importation companies purchase.  Accordingly, to receive their chemicals at Mexican ports, the Defendant and/or his coconspirators had to present proof of ownership to freight carriers, including the corresponding invoices and bills of lading; only then would their cargo be released to their custody.

The Defendant himself has shown his property interest in at least three seized chemical shipments. For example, in a phone call with HSI, the Defendant acknowledged that he was the broker of oxalic acid seized in February and August 2021 and of methylamine hydrochloride

seized in June 2021.  The Defendant then took steps to prove ownership or association with the oxalic acid shipments that were seized in February, August, and September 2021 to facilitate their release from U.S. law enforcement's custody, including possessing relevant invoices and bills of lading on his person—an act consistent with his ownership of, or association with, the seized chemicals.  Therefore, the proposed documents are admissible under FRE 803(15).  *C.f. United States v. Boulware*, 384 F.3d 794, 807 (9th Cir. 2004) (interpreting FRE 803(15) and applying it to a state court judgment as a document that affected interest in property); *Silverstein v. Chase*, 61 F. App'x 743, 744-45 (2d Cir. 2003) (affirming admission of debt-cancelation document under FRE 803(15)).

In short, the proffered purchase and shipping documents are direct evidence of the charged conspiracy, properly authenticated, and not barred by the rule against hearsay.  The Court therefore should find the records admissible.

## III.  EVIDENCE OF UNCHARGED CRIMINAL ACTS

The Government also moves to introduce evidence of: 1) the Defendant's distribution of chemicals used to produce fentanyl; and 2) seizures of bulk shipments of chemicals connected to the conspiracy that occurred after the grand jury returned the indictment on September 3, 2021. The proposed evidence should be admitted as direct evidence because it reflects acts undertaken as part of the charged conspiracy or contemporaneously with and in furtherance of it.   In the alternative, the proffered evidence is admissible as other acts evidence under FRE 404(b).

### A. Background

The Government seeks to introduce evidence of six chemical seizures that are not encompassed by the indictment either because the seizures occurred after the date of the indictment or the seized chemicals were precursors for a drug other than methamphetamine.  These seizures

include: 1) two post-indictment shipments of approximately 44 and 22 tons of acetic acid, a chemical used to produce methamphetamine, seized by U.S. law enforcement authorities in Houston, Texas, on December 14, 2021, and January 10, 2022, respectively; 2) three shipments of approximately 19,958 kilograms, 22,686 kilograms, and 22,686 kilograms of oxalic acid, a chemical used to produce fentanyl, seized by U.S. law enforcement authorities in Texas, on February 25, 2021, August 23, 2021, and September 1, 2021, respectively; and 3) approximately 750 kilograms of 4-piperidone hydrochloride monohydrate, a chemical used to produce fentanyl, seized by Mexican law enforcement authorities in the Port of Manzanillo, Mexico, on January 22, 2021.  The seizure evidence consists of expert testimony alongside invoices and bills of lading for the shipments.  Similar to documents discussed in Section II above, these documents link the seized chemicals to chemical importation companies registered to the Defendant or his coconspirators and are business records that establish ownership in property.

Finally, U.S. law enforcement obtained a search warrant for two of the Defendant's email accounts.  One of the accounts contained invoices for chemicals known to be used in the manufacture of fentanyl, PCP, and the processing of cocaine. These include a 2018 invoice for propionyl chloride, an immediate precursor for fentanyl; two invoices for cyclohexanone, which is used in PCP production, one from 2018 and one from 2020; and a 2018 invoice for tetramisole, which used in the processing of cocaine.

**B. <u>Legal standard</u>**

As a threshold matter, courts determining the admissibility of uncharged acts consider whether the evidence is "intrinsic" or "extrinsic" to the charged crimes.  The distinction is meaningful because "acts 'extrinsic' to the crime charged are subject to Rule 404(b)'s limitations; acts 'intrinsic' to the crime are not." *United States v. Machado-Erazo*, 47 F.4th 721, 728 (D.C.

Cir. 2018) (cleaned up); *United States v. Fitzsimons*, No. 21-CR-158, 2022 WL 1658846, at *2 (D.D.C. May 24, 2022) ("Rule 404(b) only applies to truly 'other' crimes and bad acts; it does not apply to [intrinsic crimes, i.e.,] 'evidence . . . of an act that is part of the charged offense' or of 'uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'" (quoting *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016))).

        *i.   Intrinsic evidence*

Although the D.C. Circuit has adopted a narrower view of "intrinsic" evidence compared to some of its sister circuits, it has held that in at least the following two circumstances, evidence is intrinsic to the charged crimes: 1) when evidence "is either of an act that is part of the charged offense" *or* 2) is of "uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime." *McGill*, 815 F.3d at 879 (quoting *Bowie*, 232 F.3d at 929); *United States v. Roberson*, 581 F. Supp. 3d 65, 71 (D.D.C. 2022) (discussing D.C. Circuit's approach to "intrinsic" evidence). In addition, evidence of an uncharged act is also intrinsic when offered as "direct evidence of a fact in issue." *Roberson*, 581 F. Supp. 3d at 71; *McGill*, 815 F.3d at 879 (defining intrinsic evidence as acts "intertwined with the commission of charged crimes"); *United States v. Khanu*, 664 F. Supp. 2d 80, 82 (D.D.C. 2009) (same).

Moreover, in conspiracy cases, the prosecution is "usually allowed considerable leeway in offering evidence of other offenses" to present the jury with helpful background on the conspiracy charged. *Machado*, 47 F.4th at 728. For example, the D.C. Circuit has admitted evidence of uncharged acts in conspiracy cases to illustrate "the kind of organizational control" a defendant exercised, their intent to "act in concert," or "the nature of a conspiracy." *Id.* at 728-29 (citing cases and admitting uncharged acts as direct evidence to show nature and purpose of conspiracy).

In short, in conspiracy cases, "evidence closely related to the conspiracy alleged in the indictment is admissible as intrinsic evidence." *Lorenzana-Cordon*, 141 F. Supp. 3d at 40 (citing *United States v. Badru,* 97 F.3d 1471, 1475 (D.C. Cir. 1996)).

> ### ii.     Extrinsic evidence

Acts not otherwise intrinsic to the charged crimes may nonetheless be admissible under FRE 404.  Rule 404(a) prohibits the admission of "other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(a).  Rule 404 then provides a non-exhaustive list of proper purposes for other acts evidence, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  *Id.*  "The government need not show that the evidence is being offered for one of the purposes specifically enumerated in the rule." *Khanu*, 664 F. Supp. 2d at 83.  Under FRE 404(b), evidence of "bad acts" is admissible for any relevant purpose "'so long as the evidence is not offered *solely* to prove character.'"  *United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002).  Accordingly, Rule 404(b) is "'a rule of inclusion rather than exclusion.'"  *Machado*, 47 F.4th at 728; *United States v. Williams*, 507 F. Supp. 3d 181, 189 (D.D.C. 2020) (stating that despite FRE 404's restrictive framing, the D.C. Circuit views the Rule as "quite permissive").

To admit evidence under FRE 404(b), courts apply a two-step analysis.  Courts first determine whether the evidence of uncharged acts "is relevant to a material issue other than character."  *Lorenzana-Cordon*, 141 F. Supp. 3d at 39; Fed. R. Evid. 401 (defining relevant evidence).  If so, courts then conduct a balancing test under FRE 403, excluding evidence only when "its probative value is substantially outweighed by a danger of" undue prejudice, delay, or confusion.  Fed. R. Evid. 403; *Lorenzana-Cordon*, 141 F. Supp. 3d at 39 (laying out the two-step

analysis).  "In determining whether 'the probative value is substantially outweighed by the danger of unfair prejudice' it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged."  *United States v. Harrison*, 679 F.2d 942, 948 (D.C. Cir. 1982); *see also United States v. Turner*, No. CRIMA 06-0026 CKK, 2006 WL 1980232, at *3 (D.D.C. July 12, 2006) ("In close cases, the rule tilts toward the admission of the uncharged conduct evidence.").

## C. Evidence of uncharged distribution of chemicals for methamphetamine and fentanyl production is admissible

The Defendant's acts of uncharged chemical distribution are admissible direct evidence of the charged drug conspiracy because they are acts performed as "part of" the same scheme or plan. *McGill*, 815 F.3d at 879 (quoting *Bowie*, 232 F.3d at 929).  The chemicals acquired by the Defendant for which he was not charged are a subset of the chemicals the Defendant and/or his coconspirators purchased for years to supply Mexican drug cartels, using many of the same companies, networks, and resources.  *See, e.g.*, *United States v. Wilkerson*, 656 F. Supp. 2d 22, 33 (D.D.C. 2009), *aff'd*, 966 F.3d 828 (D.C. Cir. 2020) ("The possibility of overlapping conspiracies is well-recognized in the law."); *Badru*, 97 F.3d at 1475 ("In cases where the incident offered is part of the conspiracy alleged in the indictment, the evidence is admissible under Rule 404(b) because it is not an 'other' crime. The evidence is offered as direct evidence of the fact in issue.").

The seizures are admissible direct evidence because they are evidence of uncharged contemporaneous acts that furthered the charged drug conspiracy.  *McGill*, 815 F.3d at 879.  The three oxalic acid seizures, the 4-piperidone hydrochloride monohydrate seizure in January 2021, and the 2018 and 2020 purchases of propionyl chloride, cyclohexanone, and tetramisole documented in the Defendant's emails all occurred during the charged drug conspiracy.  Even the

two post-indictment seizures are evidence of uncharged *contemporaneous* acts because the chemicals were purchased weeks before the seizure dates.  In fact, the conspiracy was ongoing for months *after* the Defendant's arrest and indictment, as evidenced by communications between the Defendant's coconspirators that were intercepted during a Mexican judicialized wiretap, and the Defendant never took steps to affirmatively withdraw from the conspiracy.  *See, e.g.*, *United States v. Apodaca*, 275 F. Supp. 3d 123, 134 (D.D.C. 2017) ("[T]he mere fact that a defendant is arrested does not, without more, demonstrate withdrawal from a conspiracy."); *United States v. Sitzmann*, 856 F. Supp. 2d 55, 59 (D.D.C. 2012) ("Some [uncharged] bad acts can be so close in time and place as to be a part of the charged crime.  And this may be particularly so in conspiracy cases, which involve an ongoing course of conduct rather than a single act.").  Therefore, the evidence of the six seizures and one purchase at issue are admissible direct evidence.

In the alternative, the proposed evidence is admissible under FRE 404(b).  The chemicals used in the manufacture of methamphetamine are probative not only of the Defendant's motive and opportunity to engage in narcotrafficking, but also of the scope, persistence, and cohesiveness of the charged conspiracy.  *See, e.g.*, *United States v. Latney*, 108 F.3d 1446, 1450 (D.C. Cir. 1997) (noting "the principles governing" FRE 404(b) evidence "are the same whether the conduct occurs before or after the offense charged"); *United States v. Mitchell*, 49 F.3d 769, 776 (D.C. Cir. 1995) (noting "subsequent acts may sometimes be relevant to the intent underlying an earlier act"); *United States v. Schardar*, 850 F.2d 1457, 1462-63 (11th Cir. 1988) (affirming admission of testimony on uncharged misconduct that occurred nine months after last charged act as probative of defendant's intent).

The seized chemicals used to produce fentanyl and the invoice for immediate fentanyl precursors, as well as chemicals used to produce PCP and process cocaine, in the Defendant's

emails are additionally probative of "absence of mistake."  The Defendant maintains that he only used his chemical company for lawful business activities.  As a result, the Defendant's knowledge and intent are material, disputed issues in this case.  Evidence that the Defendant procured chemicals for fentanyl and PCP production and cocaine processing, in addition to methamphetamine production, makes it less likely that the chemicals he procured were for innocent or legitimate purposes.  *See, e.g.*, *Mitchell*, 49 F.3d at 775-76 (affirming admission of uncharged methamphetamine act as probative of defendant's intent to engage in cocaine trafficking); *Sitzmann*, 856 F. Supp. 2d at 63 (noting admissibility of other crimes to show intent, absence of mistake, opportunity, and preparation; collecting cases).  Thus, the evidence of the Defendant's procurement of chemicals used in fentanyl and PCP production and cocaine processing are particularly relevant.

### D. The non-indicted conduct is not unfairly prejudicial

The proffered evidence also passes the FRE 403 balancing test because it is relevant to the charged crimes and its probative value significantly surpasses any potential prejudicial effect.  *See Lorenzana-Cordon*, 141 F. Supp. 3d at 39 (laying out FRE 403's two-step analysis); Fed. Evid. R. 403 (providing that courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice").  As explained above, the evidence is highly probative of the Defendant's knowledge and intent, which are in dispute.  Under D.C. Circuit precedent, judges "have frequently upheld the admission of evidence regarding other drug transactions as relevant to intent in a charged drug transaction." *Mitchell*, 49 F.3d at 776 (affirming admission of uncharged methamphetamine deal to prove cocaine-related drug conspiracy, noting the contemporaneous nature of the methamphetamine deal and the government's need to prove "the specific intent to further the common unlawful objective" of the charged drug conspiracy;

16

concluding the evidence had "*significant* probative value" because defendant put their intent "squarely at issue").

The proffered evidence also is probative of several other facts at issue, including the Defendant's opportunity and ability to traffic large amounts of narcotics into the United States. That the Defendant procured chemicals used to manufacture fentanyl, PCP, and cocaine makes it more likely he had the knowhow, networks, and resources to engage in methamphetamine production as well. *See, e.g.*, *Latney*, 108 F.3d at 1448 (affirming admission of separate drug offense evidence because it increased the likelihood that defendant "was knowledgeable about the drug trade" at the time of the charged offense); *United States v. Sitzmann*, 74 F. Supp. 3d 96, 118 (D.D.C. 2014), *aff'd,* 893 F.3d 811 (D.C. Cir. 2018) (admitting evidence of uncharged drug activity to show opportunity, among others, to engage in narcotrafficking). The evidence at issue also shows the ongoing nature and scope of the charged conspiracy, which continued well past the Defendant's arrest date and involved other narcotics beyond methamphetamine. In short, the evidence at issue has significant probative value.

Moreover, the proffered evidence "involves criminal activity that is no more serious than that charged in the indictment," and presents minimal risk of undue prejudice, confusion, or waste of time. *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 185 (D.D.C. 2015); *see also Abu Khatallah*, 2017 WL 11493960, at *3 (noting the "limited risk of unfair prejudice" of other acts that were "not inflammatory compared to the [charged] crimes"). Even if the proffered evidence was highly prejudicial—which it is not—the risk of undue prejudice can be sufficiently reduced by issuing limiting instructions to the jury. *See, e.g.*, *Mitchell*, 49 F.3d at 777 (affirming admission of defendant's other drug activities despite risk of "impermissible inference[s]" partly due to limiting jury instructions); *Cassell*, 292 F.3d at 796 (upholding admission of evidence of

prior gun possession in a subsequent trial for gun possession, noting that proper jury instruction "can sufficiently protect a defendant's interest in being free from undue prejudice"); *United States v. Crowder*, 141 F.3d 1202, 1210 (D.C. Cir. 1998) (en banc) (stating that mitigating jury instructions enter into the Rule 403 balancing analysis); *Harrison*, 679 F.2d at 948 (noting "balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged").

Thus, the proffered evidence passes the FRE 403 balancing test and is admissible as direct evidence, or in the alternative, as other acts evidence under FRE 404(b).

## IV. AUTHENTICATION OF ELECTRONIC EVIDENCE

The Government also moves to authenticate electronic evidence using certifications of custodians of records pursuant to FRE 902(13). This motion also provides formal notice, pursuant to FRE 902(11), of Government's intent to introduce the records referenced below at trial.

### A. Background

At trial, the Government intends to introduce electronic evidence produced by Oath Holdings Inc. ("Oath") pursuant to search warrants. The electronic records include subscriber details and contents of emails for two email addresses used by the Defendant to commit the crimes for which he is charged in this case. Each production was accompanied by a certificate of authenticity from a custodian of records attesting under penalty of perjury that the records produced by an electronic process or system are true and accurate copies of the records as maintained by Oath in the regular course of business. Copies of the certifications are attached hereto as Exhibit 2.

**B. Legal standard**

FRE 902(13) provides the following about "Certified Records Generated by an Electronic Process or System":

> A record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12). The proponent must also meet the notice requirements of Rule 902(11).

Fed. R. Evid. 902(13). The Advisory Committee Note to Rule 902(13) explains that the Rule "specifically allows the authenticity foundation that satisfies Rule 901(b)(9) to be established by a certification rather than the testimony of a live witness" because "the expense and inconvenience of producing a witness to authenticate an item of electronic evidence is often unnecessary." Fed. R. Evid. 902 (advisory committee note to 2017 amendments).

Under FRE 902(13), reference to Rule 902(11) "is only to the procedural requirements for a valid certification" and is not intended to require proof of "the substantive terms of the business record exception to the hearsay rule under Rule 803(6)." *See id.* A declaration under Rule 902(11) must be made by a "custodian or another qualified person" and provide, in relevant part that:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and]
> (C) making the record was a regular practice of that activity[.]

Fed. Rs. Evid. 803(6)(A)-(C), 902(11).

**C. Analysis**

The certifications accompanying the electronic evidence that Oath has produced meet the requirements of Rule 902, subsections (11) and (13). Therefore, the certifications properly

authenticate the corresponding records without the need for the testimony of custodians of records at trial.

Each certificate identifies the affiant as someone who is a custodian of records or otherwise qualified to authenticate the records on behalf of the company producing them.  Each certificate attests that: 1) the documents produced are records that were made and kept by the automated systems of the company; 2) they reflect data recorded at or near the time they were entered or transmitted by the user; 3) they were kept in the course of a regularly conducted activity; and 4) keeping such records is a regular practice of the company.  Each certificate also authenticates the entire respective production from Oath.  The certificates therefore meet the procedural requirements of Rule 902(11) and are sufficient to authenticate the records under Rule 902(13). *See, e.g.*, *United States v. Nicolescu*, No. 1:16-cr-00224, ECF 70 at 2 (N.D. Ohio, May 31, 2018) (accepting certifications from Yahoo, *i.e.*, Oath, among others, as sufficient to authenticate records without need for live testimony of witnesses).[9]

Further, because the Government is offering the affidavits solely for the purpose of authenticating non-testimonial evidence, the affidavits do not pose a Confrontation Clause problem.  *See United States v. Yeley-Davis*, 632 F.3d 673, 680 (10th Cir. 2011) (holding that "Rule 902(11) certifications of authenticity are not testimonial" where the purpose of the certifications are "merely to authenticate records—and not to establish or prove some fact at trial"); *United*

---

[9] Few published opinions have been issued on Rules 902(13) and 902(14) since they went into effect on December 1, 2017.  This "paucity of opinions" is likely because the rules "are functioning exactly as intended: Adversaries are either stipulating to the authenticity of electronic evidence, or courts are accepting certifications under Rules 902(13) and 902(14) in a straightforward manner without challenges or protracted litigation."  Andrew Schupanitz & Jacklin Chou Lem, *Judges' Treatment of Federal Rules of Evidence 902(13) and 902(14)*, 68 DOJ J. Fed. L. & Prac. 109, 113 (2020).  Rule 902(14), although not at issue here, allows for authentication of data copied from an electronic device, storage medium, or file by certification. Fed. R. Evid. 902(14).

*States v. Forty-Febres*, No. 16-330 (ADC), 2018 WL 2182653 (D.P.R. May 11, 2018) ("Although

the investigator's [Rule 902(13)] certificates attesting to the authenticity of the registration records

were 'prepared for use at trial,' the certificates do not pose a Confrontation Clause problem.");

Hon. Paul W. Grimm *et. al.*, *Authenticating Digital Evidence*, 69 Baylor L. Rev. 1, 48 (2017) ("If

an authentication under Rule 902(11) is sound because it authenticates data that is not testimonial

. . . then there is no reason why an authentication under Rule 902(13) would be problematic when

it, too, authenticates nontestimonial evidence.").

## V.   **CONCLUSION**

For the foregoing reasons, the Court should grant the Government's motion.

Respectfully submitted this 16th day of June, 2023.

> Respectfully submitted,
>
> MARLON COBAR
> Acting Chief
> Narcotic and Dangerous Drug Section
> Criminal Division
> U.S. Department of Justice
>
>
> By:    /s/ *Nhan Nguyen*
> NHAN NGUYEN
> KATE NASEEF
> KAITLIN SAHNI
> Trial Attorneys
> Narcotic and Dangerous Drug Section
> Criminal Division
> U.S. Department of Justice
> 145 N Street, NE, Second Floor East
> Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via ECF to the defendant's counsel on record this 16th day of June 2023.

/s/ *Nhan Nguyen*
Nhan Nguyen
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
Department of Justice
