UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Case No. 21-597 (BAH) |
| JAVIER ALGREDO VAZQUEZ, | Judge Beryl A. Howell |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Defendant faces trial on July 17, 2023 on charges of engaging in three conspiracies: conspiring, between around 2011 until September 23, 2021, to manufacture and distribute methamphetamine for importation into the United States; conspiring, in the same time period, to distribute listed methamphetamine precursor chemicals; and conspiring, from around 2018 to September 23, 2021, to launder monetary instruments. Indictment, ECF No. 8. The government has moved pre-trial to introduce: (1) shipping records of bulk chemical shipments authenticated by certificates from the relevant shipping companies, (2) evidence of uncharged acts by defendant, including shipments of precursor chemicals for illicit drugs other than methamphetamine and shipments of precursor chemicals seized after the indictment was returned, and (3) certified electronic evidence. Gov't's Mot. *in Limine* Introduce & Authenticate Evid. ("Gov't's Mot."), ECF No. 72. For the reasons outlined below, the government's motion is granted.

I.  DISCUSSION

The government's motion seeks to introduce three types of evidence: business records pursuant to FED. R. EVID. 803(6) and FED. R. EVID. 902(11); evidence that the government

1

argues is intrinsic to the charged conspiracies or, in the alternative, admissible pursuant to FED. R. EVID. 404(b) and 403; and electronic evidence derived from two email addresses used by defendant.  Defendant does not dispute the government's third request, which seeks to authenticate electronic records, including subscriber details and contents of emails, "using certifications of custodians of records pursuant to FRE 902(13)" that were produced by Oath Holdings, Inc. in response to search warrants for two email addresses used by defendant.  Gov't's Mot. at 18; *see generally* Def.'s Opp'n to Gov't's Mot. *in Limine* ("Def.'s Opp'n"), ECF No. 87.  Accordingly, this portion of the motion is granted as conceded, and resolution of the remaining parts of this motion requires discussion only of the admissibility of the shipping records and other acts evidence, which are addressed *seriatim*.

### A.   Shipping Records

The government seeks to introduce "documents related to the purchase and shipping of chemicals during the charged conspiracy."  Gov't's Mot. at 8.  Those documents, attached to the government's motion, include bills of lading, sea waybills, and cargo manifests for tonnage amounts of chemical shipments—including methamphetamine precursors acetic acid, citric acid, and methylamine hydrochloride—originating from India, China, and Turkey, and bound for Mexico.  *See* Gov't's Mot., Ex. 1, Shipping Documents, ECF No. 72-1.  The government represents that these documents encompass both (1) evidence of "four bulk shipments of chemicals that can be used to manufacture methamphetamine that were seized by U.S. law enforcement authorities during the time period charged," and (2) evidence of other chemical shipments during the charged conspiracy not seized but that correspond with transactions in defendant's communications and bank records.  Gov't's Mot. at 3.[1]

---

[1]    The government details the following four shipments of precursor chemicals that were seized: (1) a seizure, on June 8, 2021, in Oakland, California of 24,500 kilograms of methylamine hydrochloride originating in China

The so-called "business records" exception to the rule against hearsay, FED. R. EVID. 803(6), permits the admission of records of regularly conducted activities. To satisfy the exception, the following requirements must be met:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business . . . ;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) . . . ; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

FED. R. EVID. 803(6). FED. R. EVID. 902(11), as referenced in part (D) of the business records exception, permits certificates by records custodians, rather than live testimony, to authenticate records of a regularly conducted activity by certifying that parts (A) through (C) of the business records exception are met. *United States v. Adefehinti*, 510 F.3d 319, 324–25 (D.C. Cir. 2007). The custodian "need not have personal knowledge of the actual creation of the document." *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014) (quoting *Adefehinti*, 510 F.3d at 325).

The shipping documents attached to the government's motion are admissible under FED. R. EVID. 803(6).[2] The records, provided by three shipping companies, were accompanied by certificates of authenticity by records custodians from each company certifying the contents of

---

destined for Manzanillo, Mexico, with the invoice listing the consignee as "MB Barter" and the bill of lading listing "Jose Alberto Salinas Vazquez" as consignee, with the email address of defendant's brother, Carlos Algredo Vazquez, Gov't's Mot. at 5, n.5; (2) two seizures, on August 25 and 30, 2021, respectively, in Houston, Texas, of a total of over 50,000 kilograms of citric acid originating from China and destined for Veracruz, Mexico, with "MB Barter" designated as consignee; and (3) a seizure on September 21, 2021, in Miami, Florida of 44,400 kilograms of acetic acid originating from Turkey and destined for Manzanillo, Mexico, with "MB Barter," again, designated as consignee.

[2]     The government only included certain bills of lading, sea waybills, and cargo manifests in its attached exhibit, but the motion also argued in favor of the admission of other shipping records and invoices not enclosed and vaguely described. *See* Gov't's Mot. at 4. Only those shipping documents enclosed in Exhibit 1 are addressed in this Memorandum Opinion and Order.

the relevant documents. *See* Gov't's Mot., Ex. 1 at 1 ("Maersk Certificate of Authenticity"), ECF No. 72-1; Gov't's Mot., Ex. 1 at 14 ("MSC Certificate of Authenticity"), ECF No. 72-1; Gov't's Mot., Ex. 1 at 30 ("Hamburg Certificate of Authenticity"), ECF No. 72-1. Each signed certificate attests that: (a) the attached records "were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters," (b) the records were kept in the "ordinary course of a regularly conducted business activity," and (c) those records were made "as a regular practice," satisfying the requirements of FED. R. EVID. 902(11), and consequently, FED. R. EVID. 803(6)(A)–(D). *See* Maersk Certificate of Authenticity; MSC Certificate of Authenticity; Hamburg Certificate of Authenticity.

Defendant urges that he is "unable to stipulate as to the authenticity of the 'shipping documents'" because "it remains unclear under what circumstances the seizures occurred in the United States." Def.'s Opp'n at 2. On this point, defendant says that the government has provided conflicting explanations for the four chemical shipment seizures by U.S. authorities—either that the ships were hailed to American ports for inspection based on triggering information, or that they made a "'routine' stop in the United States." *Id.* at 2–3. In reply, the government clarified that both explanations were true as to different shipments: some were scheduled to stop at a U.S. port, and others were hailed by Homeland Security Investigations based on triggering information and then voluntarily complied. Gov't's Reply at 2–3, ECF No. 97. Regardless, defendant's gripe is a red herring, because the manner of the shipments' seizure does not impugn the trustworthiness of the shipping documents themselves, which were subsequently requested from the shipping companies and not physically obtained during the shipment seizures. Gov't's Reply at 3. *See* FED. R. EVID. 803(6)(E).

4

At the same time, though overcoming the hearsay and authentication hurdles, the government must still lay a foundation for the relevance of each document before such evidence is introduced at trial. The government's motion does not adequately explain the relevance of each shipping document to the charges defendant faces.[3] For example, the government will have to produce evidence linking defendant to the company MB Barter, which is the consignee for the four seized shipments. *See supra* n.1; *see also, e.g.,* Gov't's Mot., Ex. 1 at 17, Cargo Manifest, Maersk Seville, ECF No. 72-1 (describing a shipment of citric acid from China with the consignee MB Barter & Trading Mexico SA DE); Gov't's Mot., Ex. 1 at 31, Bill of Lading, APL Charleston, ECF No. 72-1 (describing another citric acid shipment from China with the consignee MB Barter & Trading Mexico SA DE). Additionally, although the government represents that "[t]he shipping documents the Government intends to introduce list the Defendant's U.S.-based company, Pro Chemie New York Inc. . . . or Carlos [Algredo Vazquez]'s Mexico-based company, MB Barter & Trading Mexico SE DE CV," Gov't's Mot. at 4, the name of neither company appears on certain documents the government seeks to admit. *See, e.g.,* Gov't's Mot., Ex. 1 at 22, Bill of Lading, MSC Jeanne, ECF No. 72-1 (describing oxalic acid shipment from India with consignee and notify party listed as "GME 860310 FQ1 Enrique Rebsamen No. 706 . . ."). The government will have to establish the relevance of those shipments in terms of their linkage to defendant or the charged conspiracies in some way.

B.  **Evidence of Uncharged Acts**

---

[3]  Five of the bills of lading enclosed in Exhibit 1 bear issuance dates *after* the indictment was returned, despite the government's representation in its motion that those documents were "related to the purchase and shipping of chemicals *during the charged conspiracy*." Gov't's Mot. at 8 (emphasis added). *See* Gov't's Mot., Ex. 1 at 22–27 (listing issuance dates between October and December 2021). The admissibility of those documents is governed by the discussion of evidence of post-indictment activity *infra*, at Section I.B.

The government also moves to introduce evidence "not encompassed by the indictment," namely: shipments of methamphetamine precursor chemicals seized post-indictment, as well as shipments of precursor chemicals for drugs other than methamphetamine that occurred concurrently with the methamphetamine conspiracies. Gov't's Mot. at 10–11. Evidence of the post-indictment activity would include expert testimony and shipping documents regarding two shipments of acetic acid, a methamphetamine precursor chemical, seized on December 14, 2021 and January 10, 2022, respectively. *Id.* In addition, the government seeks to introduce evidence that, during the course of the charged drug conspiracies, defendant was engaged in distributing chemicals to manufacture other illicit drugs, including fentanyl, phencyclidine (PCP), and cocaine, in the form of the following: (1) expert testimony and shipping documents allegedly linking defendant to four seized shipments of fentanyl precursor chemicals; and (2) invoices derived from defendant's email accounts revealing that he ordered other chemicals, including a chemical precursor for fentanyl, a chemical used in the production of PCP, and a chemical used to process cocaine. *Id.* The government urges that this other-illicit drug and post-indictment evidence is admissible as "contemporaneous acts that furthered the charged drug conspiracy," and were part and parcel of the alleged drug conspiracy itself, rather than other acts contemplated by FED. R. EVID. 404(b). *Id.* at 14. Only in the alternative does the government argue that this evidence is admissible under FED. R. EVID. 404(b).

Rule 404(b) provides that evidence of a "crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). So-called "propensity" evidence is excluded not because it is irrelevant, but because "it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity

6

to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475–76 (1948). Rule 404(b) thus attempts to head off the risk that, presented with such evidence of a defendant's uncharged bad conduct, "a jury [might] convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment." *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)). Nevertheless, although such propensity evidence may not be used to "prov[e] that a person's actions conformed to his character," *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc), it may be used for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," FED. R. EVID. 404(b)(2). "In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character." *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990). As the rule merely prohibits evidence of a defendant's other acts "in but one circumstance," the D.C. Circuit has characterized it as "a rule of inclusion rather than exclusion." *United States v. Machado-Erazo*, 47 F.4th 721, 728 (D.C. Cir. 2018) (first quoting *Crowder*, 141 F.3d at 1206 and then quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).

"[A] threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of charged crimes." *Id*. The law is clear that "[a]cts 'extrinsic' to the crime charged are subject to Rule 404(b)'s limitations," while "acts 'intrinsic' to the crime are not." *Id.* (citing *Bowie*, 232 F.3d at 927). Less clear is the distinction between extrinsic and intrinsic acts, which the D.C. Circuit has described as "plague[d]" with "practical and definitional problems." *United States v. Alexander*,

7

331 F.3d 116, 125 n.13 (D.C. Cir. 2003).  The D.C. Circuit has interpreted intrinsic evidence narrowly, limiting it to "acts that are 'part of the charged offense' itself or that are 'performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'"  *United States v. McGill*, 815 F.3d 846, 883 (D.C. Cir. 2016) (quoting *Bowie*, 232 F.3d at 929).  *Accord United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 159 (D.D.C. 2020).  Evidence that simply "complete[s] the story," on the other hand, is not inherently intrinsic.  *United States v. Roberson*, 581 F. Supp. 3d 65, 71 (D.D.C. 2022) (quoting *Bowie*, 232 F.3d at 929).  In the context of conspiracy charges, acts intrinsic to a conspiracy may include evidence of acts "link[ing] a defendant to other defendants," "show[ing] the nature of a conspiracy and the kind of organizational control a defendant exercised," and "show[ing] the defendants' intent to act in concert."  *Machado-Erazo*, 47 F.4th at 729 (internal quotation marks and citations omitted).

Evidence of precursor chemical shipments seized after the grand jury returned the indictment is extrinsic to the charged offenses.  The government urges that the seizures of methamphetamine precursor chemicals in December 2021 and January 2022 were "uncharged *contemporaneous* acts because the chemicals were purchased weeks before the seizure dates."  Gov't's Mot. at 15.  The government provides no information, however, as to when the shipments were actually ordered—indeed, using the measure of "weeks before the seizure" means that the dates the shipments were ordered likely still occurred after the grand jury returned the indictment on September 23, 2021.  Gov't's Mot. at 15; Indictment at 1.  Thus, evidence that defendant continued to engage in narcotrafficking *after* the conclusion of the charged conspiracy offenses is not "part of the charged offense" or "performed contemporaneously with the charged crime."  *McGill*, 815 F.3d at 883.

Nor is evidence that defendant and his co-conspirators distributed precursor chemicals for other illicit drugs intrinsic evidence of the charged drug conspiracies. The indictment solely charges defendant with conspiring to manufacture and distribute methamphetamine in Count One, and conspiring to distribute chemicals for the manufacture of methamphetamine, in Count Two—not a broader, multi-drug conspiracy. Indictment at 1–2. The government urges that the other-drug chemical shipments were "part of" the same overall precursor chemical scheme charged in the indictment, because defendant and his co-conspirators purchased the chemicals using "many of the same companies, networks, and resources," to supply the same Mexican drug cartels as they did the methamphetamine precursor chemicals, Gov't's Mot. at 14. Accordingly, the government contends, the seizures and records are "evidence of uncharged contemporaneous acts that furthered the charged drug conspiracy." *Id.*

The government's argument is, essentially, that defendant and his coconspirators used the same *modus operandi* to operate a global operation to purchase and send from abroad to Mexico precursor chemicals for the illegal manufacture, distribution and importation into the United States of methamphetamine, as charged in the indictment, as well as for other illegal narcotics. Yet, under binding D.C. Circuit precedent, such *modus operandi* evidence has been deemed to be extrinsic, rather than intrinsic, evidence and therefore subject to the limitations of Rule 404(b). *See, e.g., United States v. Burwell*, 642 F.3d 1062, 1066–67 (D.C. Cir. 2011) (describing *modus operandi* evidence as typically admitted "pursuant to the identity exception" to Rule 404(b)); *United States v. Pindell*, 336 F.3d 1049, 1058 (D.C Cir. 2003) (describing the admission of similar acts to the charged crimes to illustrate the defendant's *modus operandi* as a "textbook case for the application of Rule 404(b)"); *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003) (holding that evidence relevant "to show a pattern of operation that would suggest intent

and that tends to undermine the defendant's innocent explanation" is admissible under Rule 404(b) (internal quotations omitted)).

The more prudent approach requires close examination of whether the "other acts" facilitated the charged conduct. *See Bowie*, 232 F.3d at 929 (noting that "some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime"). Here, the proffered "other acts" flunk that test. The distribution of precursor chemicals to make fentanyl, PCP and cocaine falls outside the charged conspiracies to manufacture and distribute methamphetamine and to distribute chemicals to manufacture methamphetamine. *See* Indictment at 1–2. Nor did shipments of chemicals related to other drugs "facilitate" the commission of the methamphetamine conspiracy; rather, the conspiracies apparently ran in parallel. *Cf. McGill*, 815 F.3d at 881–82 (holding evidence of violence by defendants was intrinsic to conspiracy which had as its goals, *inter alia*, collecting debts with violence and enforcing internal discipline); *United States v. Appiah*, Case No. 19-cr-361, 2020 WL 3469688, *8 (D.D.C. June 25, 2020) (admitting as intrinsic evidence text messages illustrating the existence and origins of the alleged conspiracy).

Evidence of the post-indictment seizures and other-drug shipments are clearly admissible under FED. R. EVID. 404(b), however. "In conspiracy prosecutions, the prosecution is 'usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" *Machado-Erazo*, 47 F.4th at 728–29 (quoting *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000)). First, evidence regarding the post-indictment seizures of methamphetamine precursor chemicals "are probative not only of the Defendant's motive and opportunity to engage in narcotrafficking, but also of the

scope, persistence, and cohesiveness of the charged conspiracy." Gov't's Mot. at 15. Second, the evidence of other drug precursor chemicals reveals absence of mistake, "mak[ing] it less likely that the chemicals [defendant] procured were for innocent or legitimate purposes." *Id.* at 16. Defendant's primary defense that the chemicals he imported were intended for legitimate purposes is undermined by evidence that he imported a wide variety of chemicals, many of which (or perhaps even all) are used in the illicit drug manufacturing trade.[4]

Defendant's argument that the government failed to provide the "reasonable notice" required for the use of evidence admissible under Rule 404(b) is unavailing. *See* Def.'s Opp'n at 3–4. The government filed this motion approximately one month before the trial is set to begin, and in accordance with the briefing schedule set by the Court and suggested by the parties, after granting numerous extensions requested by the parties. *See* Minute Order (Jan. 12, 2023). Even before providing defendant formal notice of its intent to introduce evidence that defendant distributed precursor chemicals for other drugs, the government made clear to defendant that it had such evidence. As early as October 2022, the government indicated that precursor chemical shipments linked to defendant could also be used to manufacture fentanyl. *See* Gov't's Mot. Interlocutory Sale of Property at 5, ECF No. 32. In April 2023, the government informed defendant that it would file a notice of its intent to introduce evidence under Rule 404(b). *See* Mot. Hr'g Tr. at 37–39 (4/27/2023), ECF No. 82 (government counsel describing evidence that defendant was involved in shipments of primary precursor chemicals for fentanyl).

---

[4] Relatedly, defendant argues that "the government's evidence as to methamphetamine thus far fails to connect the chemicals imported into Mexico to its production," and that the same gap plagues the government's attempt to introduce evidence of imported chemicals for the production of drugs other than methamphetamine. Def.'s Opp'n at 5. This argument misses the mark. Defendant is charged merely with *conspiring* to manufacture and distribute methamphetamine and *conspiring* to distribute listed chemicals for its manufacture—requiring that defendant "knowingly participated in the conspirac[ies] with the intent to commit the offense" and committed an overt act in furtherance of the conspiracies. *United States v. Hemphill*, 514 F.3d 1350, 1362 (D.C. Cir. 2008). The government need not prove—though it may intend to—that the very chemicals imported by defendant were subsequently transformed into methamphetamine or other illicit drugs.

11

Finally, the risk of unfair prejudice does not substantially outweigh the probative value of the uncharged acts under FED. R. EVID. 403. *See McGill*, 815 F.3d at 883 (noting courts are required to conduct a Rule 403 analysis for evidence admissible under Rule 404(b)). This evidence is highly probative of defendant's knowledge and intent—specifically, whether he knowingly participated in a conspiracy to import precursor chemicals for illicit drug manufacturing, rather than legitimate purposes. Gov't's Mot. at 16. "Evidence tending to demonstrate 'intent, plan, preparation, and motive . . . is particularly probative where the government has alleged conspiracy.'" *Mathis*, 216 F.3d at 26 (quoting *United States v. Sampol*, 636 F.2d 621, 659 & n.23 (D.C. Cir. 1980)). On the other side of the balance, this evidence is of the same nature as the intrinsic evidence that would be used to prove the methamphetamine conspiracies—namely, business records and testimony regarding chemical shipments and communications ordering them—and is "no more serious than that charged in the indictment." *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 185 (D.D.C. 2015).

## II.    ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the government's Motion *in Limine* to Introduce and Authenticate Evidence, ECF No. 72, is **GRANTED**.

**SO ORDERED.**

Date: July 12, 2023

                                                              _____
                                                              **BERYL A. HOWELL**
                                                              United States District Judge