UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 21-CR-597 (BAH) |
| v. | : | |
| JAVIER ALGREDO VAZQUEZ, | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
FOR A NEW TRIAL AND RENEWED MOTION FOR JUDGMENT OF ACQUITTAL**

The Court should deny the Defendant's Motion for a New Trial and Renewed Motion for Judgment of Acquittal ("Motion" or "Mot."). Dkt. No. 124. The evidence presented at trial was sufficient to support conviction on all counts, and the Defendant has failed to meet his burden to prove that there was a serious miscarriage of justice requiring a new trial. Accordingly, the Motion should be denied.

**I.      Background**

On July 26, 2023, a jury in the District of Columbia found the Defendant guilty of conspiracy to manufacture and distribute methamphetamine for illegal importation into the United States, in violation of 21 U.S.C. § 959(a), 960, 963 (Count One); conspiracy to distribute a listed chemical, methylamine, to produce methamphetamine for illegal importation into the United States, in violation of 21 U.S.C. § 959(b), 960, 963 (Count Two); and conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(2)(A) and (h) (Count Three).

**II.     Legal Standard**

A defendant may move for a judgment of acquittal after the close of the evidence or after a jury verdict on the ground that the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a), (c). The Court must affirm a guilty verdict if, considering the evidence in the light most

favorable to the government, it finds that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Wahl*, 290 F.3d 370, 375 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The Court "must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983). "[A] judgment of acquittal is appropriate only when there is *no* evidence upon which a reasonable juror might fairly conclude guilt beyond a reasonable doubt." *United States v. Weisz*, 718 F.2d 413, 438 (D.C. Cir. 1983).

Under Rule 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Granting a new trial "is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) (internal quotation marks and citation omitted). The Court has "broad discretion" in deciding a motion for a new trial. *Id.* However, that authority should be "exercised sparingly." *United States v. Wilkerson*, 656 F. Supp. 2d 22, 28 (D.D.C. 2009). "In considering a motion for a new trial, a district judge weighs the evidence and evaluates the witnesses' credibility and decides whether 'a serious miscarriage of justice may have occurred.'" *United States v. Rogers*, 918 F.2d 207, 213 (D.C. Cir. 1990) (quoting *Tibbs v. Florida,* 457 U.S. 31, 38 n.11 (1982) (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980))); *see also United States v. Ashworth,* 836 F.2d 260, 266 (6th Cir. 1988) (stating that court should grant motion for new trial on grounds that verdict is against weight of evidence "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict'"

(citation omitted)).   The party seeking a new trial bears the burden of proving that it is justified. *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982).

**III.   Argument**

### A. A rational trier of fact found that the Defendant knew the chemicals were used to manufacture methamphetamine, and a new trial is not justified.

The only element of the three offenses of conviction that the Defendant alleges there is insufficient evidence to support is the Defendant's knowledge that the chemicals he was purchasing, via wire transfer between the United States and China, were being used to manufacture methamphetamine.  Mot. at 1, 9.  In doing so, the Defendant's Motion mainly questions the credibility one of the Government's witness, Jesus Contreras Arceo ("Contreras").  *See* Mot. at 2-4 and 9-10.  It is the role of the jury, not the Court, to weigh the evidence and assess witness credibility.  *United States v. Battle*, 613 F.3d 258, 264-65 (D.C. Cir. 2010).  Furthermore, the evidence that was presented at trial was more than sufficient to support the jury's verdict of guilty on all counts.  Relatedly, the Defendant argues that the Government's conduct at trial—specifically objecting to inadmissible evidence and improper impeachment—prevented meaningful and complete cross-examination of Contreras, which resulted in a serious miscarriage of justice.  Mot. at 3.  However, the purpose of the Federal Rules of Evidence and Criminal Procedure is to ensure that trials are fair.

#### i. Sufficient evidence of the Defendant's guilt was presented.

Contreras was not the Government's only witness, nor was his testimony uncorroborated. The Government introduced testimony and evidence from nine other witnesses, including financial records, e-mails, WhatsApp messages, shipping documents, and wiretap calls.   Some of the facts to which Contreras testified were corroborated by other, uncontested evidence, including: (1) that

3

the Defendant and Carlos Algredo Vazquez ("Carlos") were brothers; (2) that the Defendant lived in the United States and owned a U.S. chemical company that did business with Chinese chemical companies; (3) that Carlos owned a chemical company in Mexico; (4) that benzyl alcohol, sodium acetate, nitroethane, toluene, acetone, and methylamine are all chemicals that are used to manufacture and process methamphetamine; and (5) that the Defendant procured methylamine and other chemicals used in the production of methamphetamine.  Additionally, Anthony Romo Reyes ("Romo") corroborated information provided by Contreras about a methamphetamine laboratory at "Men's" ranch in which the Defendant had invested.  Romo's testimony about the laboratory matched the testimony of Contreras on several key points, specifically: (1) Contreras sent Romo, his brother Raul, Martin Partida Ceja (Partida), and Partida's son to work at the methamphetamine laboratory; (2) "Men" was tall and light-skinned; (3) they used steel reactors to mix the chemicals to make the methamphetamine; and (4) "Peteto" was in charge of picking up the finished methamphetamine.[1]  Partida's testimony—which was introduced by the Defendant— also corroborated Contreras on all of these key points, and more.

Additionally, DEA Senior Research Chemist Joseph Bozenko reviewed the types and quantities of chemicals procured by the Defendant from 2018 to 2021, and his expert opinion based on his review of the evidence was that those chemicals were bought to make methamphetamine and fentanyl.  Transcript Day 5 AM, July 24, 2023 at 72 ("Tran. Day 5 AM").  Even the

---

[1] The Defendant alleges that "the Government called Romo to testify in an effort to confuse and unfairly prejudice the jury."  Mot. at 5.  The Defendant did not object to Romo's testimony during trial.  The Defendant himself subpoenaed Romo.  Nevertheless, Romo's testimony was relevant for the purpose described herein.  See Fed. R. Evid. 401.  At no point during his testimony did Romo identify the Defendant.  Nothing about Romo's testimony was confusing.  To the extent that Romo was a sympathetic witness, any prejudicial effect that may have had was substantially outweighed by the probative value of his testimony.  See Fed. R. Evid. 403.

Defendant's own expert chemist testified that the quantities of chemicals procured by the Defendant were not consistent with legitimate uses. The Defendant's own e-mails showed not only that he had purchased large quantities of chemicals used to manufacture methamphetamine and fentanyl, but also that he was on notice that at least one of those chemicals, methylamine, was a "prohibited product in the USA." Transcript Day 3 AM, July 20, 2023 at 36 ("Tran. Day 3 AM"); Gov. Ex. 118B. The Defendant also admitted to HSI Special Agent Doug Miller that he knew that methylamine was illegal. Transcript Day 3 PM, July 20, 2023 at 59 ("Tran. Day 3 PM").[2] Similarly, the Mexican wiretap demonstrated that Carlos—the Defendant's brother and business partner—knew that they were not running a legitimate chemical business. *See, e.g.,* Tran. Day 3 AM at 5-12; Gov. Ex. 43A, 44A, 47A, 50A, 51A, 52A, 55A, 58A. The Defendant and Carlos were in regular contact via e-mail and WhatsApp during the course of the conspiracy. Tran. Day 3 AM at 14.

### ii. Contreras's alleged "lies" were addressed by the Government in front of the jury.

In attacking Contreras's credibility, the Defendant focuses on only two statements made by Contreras, which the Defendant alleges were "outright lies." Mot. at 2. The Defendant then argues that the Government prevented him from conducting a meaningful and complete cross-examination of Contreras and thus deprived the Defendant of his right to a fair trial. Mot. at 3-4. This argument is without merit. First, Contreras did not lie when he said he did not remember failing to identify the Defendant's brother Carlos on one occasion. *See* Mot. at 2. DEA Special Agent Kevin Novick explained the photo identification procedures used with Contreras. Tran.

---

[2] The Defendant took the stand and implausibly explained that he told Agent Miller that he knew methamphetamine was illegal, not methylamine. Transcript Day 6 PM, July 25, 2023 at 27.

5

Day 3 AM at 17-18. Agent Novick explained that if a witness fails to identify someone in a photograph, DEA does not tell that witness that they failed to identify someone. *Id*. Therefore, Contreras never knew that he failed to identify the Defendant's brother Carlos in a photograph—which was shown to him during a video teleconference with the photograph displayed on a cell phone that was held up to a laptop camera—so Contreras could not have lied about his failure to identify Carlos. Furthermore, the record reflects that Contreras failed to identify Carlos on one occasion. Agent Novick testified that he was aware that Contreras was unable to identify Carlos, even though Agent Novick did not remember being at the proffer where that happened. Tran. Day 3 PM at 11.

Second, the Defendant notes that Contreras testified that he never heard audio recordings of Carlos Algredo Vazquez before he testified at trial. Mot. at 3-4. The Government attempted to correct the record on redirect, but Contreras continued to say he did not remember hearing the audio recordings previously. Transcript Day 2 PM, July 19, 2023 at 39 ("Tran. Day 2 PM"). However, the next day, Agent Novick testified that he was present when audio recordings were played for Contreras during an interview ahead of trial. Tran. Day 3 AM at 76. The jury, therefore, had the information necessary to evaluate Contreras's statements about the recordings.

        iii.    **The Defendant had an opportunity to meaningfully cross examine Contreras, consistent with the Federal Rules of Evidence, and had the opportunity to present a defense.**

The Defendant alleges that "stratagems utilized by the Government prevented the meaningful and complete cross-examination" of Contreras. Mot. at 3. First, the Defendant alleges that the Government advised defense counsel that the photograph array including Carlos provided to the defense as Jencks material was not the array shown to Contreras. Mot. at 3 and

6

10. That is not accurate. The Government advised defense counsel that the photograph array contained the six photographs that were shown to Contreras, but the photographs were shown to Contreras one at a time, not all at once on one page. This explanation was consistent with how Agent Novick testified about the photograph identification procedure. Tran. Day 3 AM at 17-18. The Government never objected to defense counsel showing Contreras the photographs. Even if defense counsel had shown the photographs to Contreras on cross examination, it is unclear what if any impeachment value that would have, since Contreras had already identified the same photograph of Carlos on direct examination. The Defendant does not argue, and cannot possibly believe, that showing him the same photograph on cross examination would result in a different outcome.

Next, the Defendant takes issue with the fact that the Government objected to defense counsel using notes from the interview where Contreras failed to identify Carlos during Contreras's cross examination. Mot. at 3. As an initial matter, the Defendant does not cite the transcript, and the Government sees no record of any such objection or attempt to use the notes. Assuming the Defendant is referring to conversations between the parties that were not on the record, the Government explained to defense counsel that the notes were not taken by Contreras, nor had he ever seen or reviewed them, therefore they could not be used to refresh his recollection. Fed. R. Evid. 612. If the Defendant wished to introduce extrinsic evidence of Contreras's prior inconsistent statement, the proper way to do that would be to call a witness that was present when Contreras failed to identify the photograph of Carlos. Fed. R. Evid. 613. The notes were not admissible through Contreras as extrinsic evidence since he could not lay the foundation to authenticate them, and even if he could, the notes themselves are inadmissible hearsay—they are

the out of court statements of the agent who took the notes.   Fed. R. Evid. 801(c).

The Defendant clearly understands that the proper method for introducing the prior inconsistent statement was calling the agent who took the notes, since he goes on to argue that the Government made the agent "unavailable." Mot. at 3. This is a misrepresentation of the facts. The Government's position, which was explained on the record, was that Group Supervisor ("GS") Kyle Mori's testimony was not necessary as it was cumulative of Agent Novick's testimony on cross examination, which clarified that Contreras had failed to identify Carlos on one occasion. Tran. Day 5 AM at 5.[3] The Defendant disagreed, and the Court told the Defendant that it would "most likely issue the subpoena" for GS Mori if the Defendant requested one. *Id.* at 8. The Defendant never requested the subpoena. Rather, the Defendant made a strategic decision not to call another Government agent, whose testimony may have done more harm than good to the defense theory.

The Defendant had an opportunity to meaningfully and completely cross examine Contreras over the course of two days, including about his extensive involvement in drug trafficking and violence, the long prison sentence he was facing, and his motivation for cooperating with the Government. In fact, defense counsel's cross examination of Contreras lasted longer than the Government's direct examination. The jury heard from Agent Novick that Contreras had failed to identify a photograph of Carlos on one occasion and had heard the audio recordings of Carlos before he testified at trial. The jury was able to weigh that evidence, along with all of the evidence that corroborated Contreras, in assessing Contreras's credibility during their deliberations. In doing so, they found the Defendant guilty on all counts.

---

[3] At the time, the Government did not have the daily transcript from the day in question—as the Government had only ordered daily transcripts of defense witnesses.

Finally, the Defendant falsely accuses the Government of hiding the ball when it came to scheduling, alleging this resulted in defense witnesses being unavailable. Mot. at 11, n.6. While initial estimates were that the Government's case in chief would last three weeks, those estimates were revised well ahead of trial, and the Defendant was aware of the new estimates. At the pretrial conference on July 14, 2023, the Government told the Court, and the Defendant, that the Government's case in chief would last until Wednesday, July 26, 2023. After a jury was empaneled, the Defendant agreed to stipulate to certain testimony, resulting in the Government not needing to call four Government witnesses. When that stipulation was reached, the Government immediately informed the Defendant that it would result in one or two days less testimony during the case in chief. The Government rested on Monday, July 24, 2023. The alleged unavailability of certain defense witnesses, located outside of the country and thus outside the Court's ability to compel attendance, was wholly unrelated to the length of the Government's case.

### B. The Government's decision to strike the alias "Men" did not create a fatal variance with the Indictment.

Before trial, the Government obtained evidence that the Defendant was not the individual identified by one potential witness as "Men," and promptly disclosed that information to the Defendant on June 7, 2023—more than a month before trial. As the Government explained to this Court and the Defendant in extensive filings before trial, *see, e.g.,* Dkt. No. 107, "Men" is another co-conspirator—like Carlos, Francisco Pulido Coracero, and the Government's cooperating witnesses at trial. Only one potential witness ever identified a photograph of the Defendant as "Men." The Government did not call that witness, but the Defendant was free to call him and in fact subpoenaed him ahead of trial. The Defendant's entire argument on this point, which was dealt with in numerous pretrial pleadings, boils down to this: the Government "deprived

10

the defense of its planned cross-examination to establish that the Defendant was not nicknamed 'Men.'" Mot. at 11. In other words, the Government did not introduce evidence it knew to be false, and that deprived the Defendant of a "gotcha" moment.

The Government's decision not to falsely present evidence that the Defendant went by the alias "Men" did not create a fatal variance with the Indictment. The Supreme Court has held that in order for a variance to be fatal it must be material.

> The true inquiry … is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused. The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense.

*Berger v. United States*, 295 U.S. 78, 82 (1935).

The Indictment charged the Defendant by his full name. Contreras identified the Defendant as Javier Algredo Vazquez, the individual he purchased chemicals from to make methamphetamine. The Defendant's name was on business records, showing that he owned Pro Chemie New York; his name was on emails with his brother Carlos, where he coordinated payment for chemicals used to manufacture methamphetamine; and his name was on financial records for Pro Chemie's Bank of America account, which the Defendant used to transfer money to China and elsewhere to purchase chemicals that are used to manufacture methamphetamine. The Defendant had all of these business, email, and financial records available to him ahead of trial. Additionally, the criminal complaint in this case summarized Contreras's testimony at trial. Finally, the Defendant knew more than a month before trial that the Government would not be

11

introducing evidence that he went by the nickname "Men." For these reasons, the Defendant was "definitely informed" of the charges against him, he was "enabled to present his defense," and he was not "taken by surprise by the evidence offered at the trial."

## IV. Conclusion

The evidence presented at trial was sufficient to support conviction on all counts, and the Defendant has failed to meet his burden to prove that there was a serious miscarriage of justice requiring a new trial. Therefore, the Government respectfully asks the Court to deny the Defendant's Motion For a New Trial and Renewed Motion for Judgment of Acquittal.

Submitted: August 31, 2023

                                           Respectfully Submitted,

                                           MARLON COBAR, Acting Chief
                                           Narcotic and Dangerous Drug Section
                                           Criminal Division
                                           United States Department of Justice

By:    */s/Kate Naseef*
        Kate Naseef, Trial Attorney
        Nhan Nguyen, Trial Attorney
        Kaitlin Sahni, Trial Attorney
        Narcotic and Dangerous Drug Section
        Criminal Division
        U.S. Department of Justice
        145 N Street, NE
        Washington, D.C. 20530
        Tel.:   (202) 616-5557
        Electronic mail: kate.naseef@usdoj.gov

**CERTIFICATE OF SERVICE**

  I hereby certify that a copy of the foregoing was sent via ECF to the Defendant's counsel on record this 31st day of August 2023.

                */s/ Kate Naseef*
                Kate Naseef
                Trial Attorney
                Narcotic and Dangerous Drug Section
                Criminal Division
                Department of Justice