**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Criminal Action No. 21-597 (BAH) |
| JAVIER ALGREDO VAZQUEZ, | Judge Beryl A. Howell |
| Defendant. | |

**MEMORANDUM OPINION**

Following his conviction by a jury of all three charges against him for conspiring to manufacture and distribute 500 grams or more of methamphetamine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(H), and 963; conspiring to distribute methylamine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(b), 960, and 963; and conspiring to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(2)(A), (h), defendant Javier Algredo Vazquez filed the pending renewed motion for judgment of acquittal, under Federal Rule of Criminal Procedure 29(c), and motion for a new trial, under Federal Rule of Criminal Procedure 33(a). *See* Def.'s Mot. New Trial ("Def.'s Mot."), ECF No. 124; Def.'s Renewed Mot. J. Acquittal, ECF No. 125. For the reasons set forth below, both of defendant's motions are denied.

## I.   BACKGROUND

As part of an extensive and long-term investigation into the drug trafficking and money laundering activities of the Cártel de Jalisco Nueva Generación ("CJNG"), a large and violent drug trafficking organization ("DTO") based in Jalisco, Mexico, responsible for trafficking bulk quantities of cocaine, methamphetamine, and opioids into the United States, the Drug Enforcement Agency ("DEA") identified several seemingly legitimate U.S. companies that

1

acquired precursor chemicals used to manufacture methamphetamine from China and imported

them into Mexico.  Defendant's U.S.-based company, Pro Chemie New York Inc. ("Pro

Chemie"), was allegedly one such company.

In September 2021, the government filed a three-count indictment against defendant,

charging him with engaging in three conspiracies: conspiring, between around 2011 until

September 23, 2021, to manufacture 500 grams or more of methamphetamine for importation

into the United States (Count One); conspiring, during the same period, to distribute listed

methamphetamine precursor chemicals (Count Two); and conspiring, from around January 2018

to September 23, 2021, to launder monetary instruments (Count Three).  *See* Indictment, ECF

No. 8.  The case proceeded to trial on July 18, 2023.  *See* Min. Entry (July 18, 2023).

### A.      The Government's Case in Chief

The government's testimonial evidence at the seven-day trial consisted of nine fact and

expert witnesses.  The first witness was Jesus Contreras-Arceo, a co-conspirator who testified,

among other things, that he was responsible, from 2009 until his arrest in 2018, for running, for

the CJNG, between eight to ten labs in Mexico that each produced approximately 200 kilograms

of methamphetamine a month for export into the United States, that he placed orders of

methamphetamine precursor chemicals for use at these labs, that the CJNG and their associates

bribed the Mexican Navy, and others, to permit the transportation of drugs via seaports, and that

he had bought some of these precursor chemicals from defendant, who, together with his brother,

Carlos Algredo Vazquez, were in business transporting chemicals from China to Mexico,

knowing that the resulting drugs would eventually be transported to Texas.  *See* Rough

Transcript of Trial (July 18, 2023 AM) ("July 18 AM Trial Tr. (Rough)") at 6:5–9:5, 15:1–4,

15:17–16:2, 20:17–21:6, 42:21–23.[1]  Specifically, Contreras-Arceo explained that one of his

workers, Peteto, would give him a list of chemicals that the CJNG labs needed, and that

Contreras-Arceo would then transmit this list to Francisco Pulido.  *Id.* at 15:1–9.  Pulido,

together with defendant and Carlos, would coordinate the acquisition of these chemicals.  *See id.*

at 15:10–16:2.  Defendant's role was to order the chemicals, using his U.S.-based company Pro

Chemie, from Chinese companies for export to Mexico.  *See id.* at 24:10–25:19.  Pulido would

tell Contreras-Arceo that the chemicals had arrived at a specific Mexican port, and Contreras-

Arceo, working with bribed government officials, would, with the help of his workers, receive

the shipments.  *See id.* at 21:9–11, 22:20–23:3; *see also id.* at 43:11–13 (Contreras-Arceo

explaining that "Peteto was in charge of transporting all the chemicals to the labs.").

      Contreras-Arceo's testimony revealed a sophisticated conspiracy that avoided detection

for years, in part by ensuring that each individual's roles and responsibilities were specifically

delineated and siloed.  Contreras-Arceo explained, for example, that the CJNG and its associates

used "slang terms for chemicals" to ensure that all but a few select individuals did not know the

official names of the chemicals stocked in the CJNG labs.  *Id.* at 10:6–17, 27:13–16.  Contreras-

Arceo viewed defendant and Carlos as on Pulido's "team" and would get in touch with them

through Pulido, using Pulido's Blackberry.  Rough Transcript of Trial (July 18, 2023 PM) ("July

18 PM Trial Tr. (Rough)") at 32:9–11; *see* July 18 AM Trial Tr. (Rough) at 22:10–12.  Indeed,

audio recordings intercepted by Mexican authorities introduced into evidence were identified by

Contreras-Arceo as the voices of Pulido and Carlos.  *See, e.g.*, July 18 PM Trial Tr. (Rough) at

7:4–14:1.  On one occasion, Contreras-Arceo wanted urgently to meet with defendant about a

seized shipment of precursor chemicals from China but, in order to reach out to defendant, had to

---

[1]     All citations to the trial transcripts cite to rough drafts of the transcript, since the final transcripts have not yet been docketed.  When the final transcripts are available, they will be posted on this case's docket.  Discrepancies in page numbers between the rough and final transcripts may exist.

ask Pulido to get in touch with Carlos, who would in turn speak to defendant.  *See* July 18 AM
Trial Tr. (Rough) at 46:7–15.  Pulido, via Carlos, ultimately advised Contreras-Arceo that
defendant could not arrive to Mexico quickly because he was based in the United States.  *Id.*

Contreras-Arceo recounted some of his communications over multiple years with
defendant, Carlos, and Pulido.  Instructed by Nemesio Oseguera Cervantes, who was the leader
of the CJNG and to whom Contreras-Arceo reported directly, to meet with Carlos to ensure that
"all the precursor chemicals that were to come from China would go to [Oseguera Cervantes]
alone," Contreras-Arceo was first introduced to Carlos by Pulido at an in-person meeting in
about 2010 at Pulido's Guadalajara office, where Pulido had a warehouse used for storing
precursor chemicals.  *Id.* at 5:22–6:10, 18:5–18, 26:9–14.  At the meeting, Carlos and Pulido told
Contreras-Arceo that they were in business together exporting chemical precursors from China to
Mexico and asked him for a favor: defendant had ordered from the Sinaloa cartel, a DTO like the
CJNG, 160 200-liter barrels of mono-methylamine, which can produce 3,200 kilograms of
methamphetamine, and wanted Contreras-Arceo to bribe the Mexican Navy to secure its safe
arrival.  *Id.* at 18:15–20:11; *see also id.* at 21:9–11 (Contreras-Arceo admitting that he was
responsible for bribing the Mexican Navy and the Mexican port's governing bodies).  In return,
Carlos agreed that defendant would become part of the partnership with Carlos and Pulido and
all the chemicals that they exported together from China would go to the CJNG.  *Id.* at 20:12–16.
When Contreras-Arceo arrived at the port to fulfill the favor, however, the Mexican Navy said
they could not help because the DEA had already seized the containers.  *Id.* at 20:17–21:6.

Contreras-Arceo recalled "g[etting] in touch" with Carlos and defendant "through"
Pulido to make two orders of mono-methylamine, totaling 60 200-liter barrels of the chemical,
which allegedly produces 1,200 kg of methamphetamine.  *Id.* at 21:16–23:15.  He then recounted

4

his second in-person meeting with Carlos and his first meeting with defendant, together with Pulido, in a cafe in Guadalajara in about 2013, during which he was told that defendant had a U.S.-based company used to export chemicals from China to Mexico, and that the brothers had "relationship[s]" and "connections" in China to enable them "to export any chemical that is prohibited to Mexico to make methamphetamines," arranged to purchase 160 200-liter barrels of "dulce" and two 20-ton containers of "iron," which would be supplied by defendant, discussed the logistics of these shipments, and told defendant and Carlos that these chemicals would be used to make methamphetamine. *Id.* at 23:16–29:10; *see also id.* at 29:10–12 (Contreras-Arceo testifying that he received the "dulce" and "iron" he agreed to purchase at this meeting).

Contreras-Arceo further described a third in-person meeting in about 2017 at Pulido's Guadalajara office, with Carlos, at which defendant and Pulido were present, during which Contreras-Arceo purchased 160 200-liter barrels of nitroethane, to be used to produce 9,600 kg of methamphetamine. *See id.* at 29:13–31:11. Contreras-Arceo explained that he "personally pa[id]" for the chemicals purchased from defendant and Carlos, most frequently by cash or wire transfers of $1,000,000 to $2,000,000 USD to Pulido, who was then responsible for transmitting payment to defendant and Carlos using exchange houses. *See id.* at 31:12–35:23. On at least one occasion, Contreras-Arceo paid defendant in two bulk deliveries of methamphetamine, which Peteto transferred to an individual named "Men," another one of Contreras-Arceo's workers, who then transferred the drugs by car to "Javier's customers" in Texas. *Id.* at 36:20–38:14.

Contreras-Arceo, in addition, testified that he not only purchased precursor chemicals from defendant but also helped defendant manufacture methamphetamine, such as by discussing profit "margin[s]," sending some of his own workers, including Martin Partida-Ceja, Partida-

Ceja's son, Antonio Romo Reyes ("Romo"), and Romo's brother, to work in a lab on a ranch that defendant rented from Men, and personally visiting the lab himself. *Id.* at 39:1–44:16. Contreras-Arceo explained that because operating a methamphetamine lab in or near Guadalajara required permission from Oseguera Cervantes, Oseguera Cervantes and defendant had a fee- or production-splitting arrangement. *See id.* at 40:7–24.

Contreras-Arceo's testimony was repeatedly corroborated. His description of how the chemicals that defendant helped transport were packaged and shipped and how these chemicals could be used to create methamphetamine, *see, e.g.*, *id.* at 19:24–20:11, was consistent with DEA Special Agent Novick's description, *see, e.g.*, Rough Transcript of Trial (July 19, 2023) ("July 19 Trial Tr. (Rough)") at 72:20–74:11. His description of Men's "ranch," where the lab defendant rented to manufacture methamphetamine was located, and its daily operations, *see, e.g.*, July 18 AM Trial Tr. (Rough) at 39:1–44:16, was consistent with the description provided by Romo, *see, e.g.*, Rough Transcript of Trial (July 24, 2023 AM) ("July 24 AM Trial Tr. (Rough)") at 22:25–23:8, 24:25–25:7, 30:11–31:4. Romo further corroborated Contreras-Arceo's association with Romo, Romo's brother, Partida-Ceja, and Partida-Ceja's son, and Contreras-Arceo's testimony that he sent the four men to work together in a methamphetamine lab on Men's ranch. *See* July 24 AM Trial Tr. (Rough) at 27:14–20, 29:8–15. He also confirmed that Peteto would pick up the methamphetamine from the lab by truck for transport off Men's ranch. *See id.* at 28:8–29:7.

Contreras-Arceo's testimony that defendant used his company to export chemicals from China to Mexico was confirmed by a plethora of documentary evidence, including business documents listing defendant as Pro Chemie's registered agent, *see* July 19 Trial Tr. (Rough) at 75:21–78:3; invoices and shipping documents reflecting that Pro Chemie transported large

quantities of chemicals that could be used to manufacture methamphetamine and fentanyl from China to Mexico, *id.* at 99:5–100:9, 105:12–106:5; and WhatsApp messages and emails between defendant and Carlos discussing orders and shipments of chemicals, the transfer money to chemical companies, and shipments that had been "detained" and other delivery "issues," *id.* at 88:11–99:4.[2]  DEA Special Agent Kevin Novick, in addition, testified in detail about several large shipments of bulk quantities of methylamine hydrochloride, oxalic acid, and citric acid on route from China to Mexico that had been seized by U.S. law enforcement in 2021, of which the government also introduced photo evidence.  *See, e.g.*, Rough Transcript of Trial (July 20, 2023 AM) ("July 20 AM Trial Tr. (Rough)") at 20:14–29:12 (22,000 kg oxalic acid shipment seized in Houston on February 25, 2021), 29:23–35:12 (44,400 kg acetic acid shipment seized in Miami on September 21, 2021), 36:7–42:8 (24,500 kg methylamine hydrochloride, a key methamphetamine ingredient, seized in Oakland on June 8, 2021).  He linked these shipments to defendant by emphasizing that the identification numbers on the seized containers, which were visible in the government's photo evidence, were the same identification numbers referenced by defendant and Carlos in their emails discussing shipments and listed on shipping documents that were found in defendant's email.  *See id.*  He further testified that the quantity and type of chemicals seized, corresponded to the quantity and type listed on Pro Chemie invoices for tens of thousands of dollars and shipping documents found in defendants' email.  *See id.*[3]  In total,

---

[2]     The government also introduced wiretap calls conducted by Mexican law enforcement officials as part of a parallel investigation, which suggested that Carlos knew that he was not running a legitimate chemical business and that many of the precursor chemicals that he and defendant were transporting were illegal to import into Mexico or the United States.  *See, e.g.*, July 19 Trial Tr. (Rough) at 58:23–25, 60:12–15, 61:17–62:6; Rough Transcript of Trial (July 20, 2023 AM) ("July 20 AM Trial Tr. (Rough)") at 5:12–15:3, 36:7–8 (email from Carlos to defendant with subject line "Reply . . . : Prohibited product in the USA").

[3]     Special Agent Novick's testimony was further corroborated by Homeland Security Investigations Special Agent Doug Miller and DEA Special Agent Adrian Owens, who testified about similar and additional seizures by U.S. law enforcement in 2021 of bulk quantities of chemicals being shipped to Mexico and linked to defendant.  *See* July 20 PM Trial Tr. (Rough) at 28:23–45:3 (Special Agent Miller), 77:24–97:11 (Special Agent Owens).  Special

Special Agent Novick estimated, based on review of defendant's emails and the invoices and shipping materials attached, that defendant assisted in procuring over 5,000,000 kilograms total of precursor chemicals.  *See id.* at 45:5–9.

DEA Special Agent Kelly Chang's testimony supported Contreras-Arceo's, insofar as it reinforced that Pro Chemie was unlikely shipping chemicals for legitimate purposes.  Special Agent Chang explained, for example, that loan documents submitted by defendant to Bank of America in 2018 stated that the company, which had been in operation for approximately three years and had two employees, had a gross revenue of $65,000 and an annual net profit of $55,000.[4]  Rough Transcript of Trial (July 20, 2023 PM) ("July 20 PM Trial Tr. (Rough)") at 111:19–112:15; *see also* Rough Transcript of Trial (July 21, 2023) ("July 21 Trial Tr. (Rough)") at 12:14–16:16 (explaining, based on tax documents, that Pro Chemie had "very minimal operational expenses").  She testified, however, that wire transfers from the Pro Chemie bank account during the same period listed that over $8,500,000 was transferred out of and over $9,000,000 was transferred into the account, of which over $5,700,000 was deposited by M.B. Barter & Trading, Carlos's chemical company.  *See* July 20 PM Trial Tr. (Rough) at 112:16–113:23.  Defendant's surprising wealth, including his five properties located in Queens, New York, valued at over $4,000,000, Special Agent Chang suggested, could not quite be explained by or squared with Pro Chemie's finances.  *See* July 21 Trial Tr. (Rough) at 21:10–12.  DEA Senior Research Chemist Joseph Bozenko Jr., who testified as an expert witness, with no objection from the defense, spoke about, *inter alia*, the types and quantities of chemicals

Agent Chang, too, linked the chemicals to defendant by connecting emails sent from Carlos to defendant asking defendant to pay for shipments of chemicals and the invoices attached to these emails with wire transfers involving Pro Chemie's bank account for amounts that corresponded with the invoices.  *See, e.g.*, *id.* at 114:24–132:6.

[4]      Defendant later admitted that although he reported that Pro Chemie had a net income of $55,000, Pro Chemie never made $55,000 a year, and that "the bank suggested that [defendant] put a greater amount in earnings in order for the loan to be approved."  *See* July 25 PM Trial Tr. (Rough) at 49:8–50:10.

procured by Pro Chemie.  *See* July 24 AM Trial Tr. (Rough) at 44:10–72:17; *see, e.g.*, *id.* at 66:24–70:19.  Like Special Agent Chang, Bozenko was not convinced that defendant was transporting drugs for legitimate purposes and rendered his expert opinion, "[b]ased on [his] training, [his] experience, [his] education, and [his] review of the evidence in the case," that those chemicals were procured "to support the manufacturing of methamphetamine, fentanyl, and cocaine."  *Id.* at 72:11–17.

### B.  Defense Cross-Examination and Defense Case

An essential part of the defense—and, as most relevant to the pending motions—was discrediting Contreras-Arceo.  In a lengthy cross-examination, lasting longer than the government's direct, the defense questioned Contreras-Arceo about his deep involvement in the CJNG, a "violent, dangerous cartel," July 18 PM Trial Tr. (Rough) at 14:10–16:22; his extensive experience manufacturing and trafficking drugs for the cartel, *see id.* at 23:20–31:25; and his plea agreement, *id.* at 19:25–23:19; July 19 Trial Tr. (Rough) at 18:8–25:2.  The defense asked Contreras-Arceo specifically about two proffer sessions he had with the government, during which he was asked to identify Carlos.  *See* July 18 PM Trial Tr. (Rough) at 33:1–8; July 19 Trial Tr. (Rough) at 9:19–10:13.  Contreras-Arceo testified on cross-examination that during the proffer sessions, he recognized and was able to pick Carlos's photo out of a group of six photos. July 19 Trial Tr. (Rough) at 9:19–10:13.

In addition to cross-examining the government's witnesses, defendant called four witnesses, including one expert witness, and testified on his own behalf.  *See* Min. Entry (July 24, 2023); Min. Entry (July 25, 2023).  Defendant's first witness was Dr. Gregory Dudley, a chemistry professor at Western Virginia University who testified, with no objection from the government, as an expert.  *See* Rough Transcript of Trial (July 24, 2023 PM) ("July 24 PM Trial

Tr. (Rough)") at 5:5–8, 9:23–10:3.  Dr. Dudley acknowledged that the chemicals that defendant had transported could be used to create methamphetamine but testified that each of these chemicals had "many, many applications," including legal or commercial industrial uses, and that his research lab stocked "[m]any, if not all" of these chemicals.  *See, e.g.*, *id.* at 11:22–12:1, 12:10–16, 22:8–23, 24:15–26:5.  He admitted on cross-examination, however, that his lab had to keep their inventory of these chemicals "low and small, both for safety and cost reasons" and thus stocked these chemicals "on the order of 50 grams, a hundred grams," or at most "liters or tens of liters" of some of the solvents—in stark contrast to the tonnage quantities defendant transported to Mexico.  *See id.* at 28:7–30:3.

Defendant's wife, Lorena Algredo, then took to the stand and maintained that defendant never talked about drugs, did not have a methamphetamine lab, never left the family for extended periods of time, and was not a drug trafficker or in any way affiliated with the CJNG. *See id.* at 51:2–53:6.  She acknowledged that defendant's business, Pro Chemie, imported chemicals into Mexico but denied her involvement in the business.  *Id.* at 49:2–15.  On cross-examination, she again denied her involvement with Pro Chemie, but, when confronted with emails from defendant to Carlos stating that "Lorena already deposited the check to Pro Chemie," she explained that she would deposit checks for defendant when he asked but did not specifically remember depositing checks into the Pro Chemie account.  *Id.* at 53:20–54:23.  She testified, in addition, about defendant's purchase of five properties in New York City, including four rental properties, and the costs associated with maintaining these properties, which totaled more than what they were collecting in rent.  *See id.* at 51:9–15; 56:15–61:7.  She revealed that defendant maintained bank accounts and real property in Mexico, including a four-family building, which even defendant's accountant did not know about.  *Id.* at 51:9–20, 56:5–14.

Defendant's accountant of 23 years, Alexander Ruiz, further testified about defendant's assets and finances. Ruiz acknowledged that while defendant earned $87,000 and $43,000 in wages working at Hyatt in 2019 and 2020, respectively, and not more than $3,174 from Pro Chemie, defendant owned property in Queens worth over $4,500,000. *See* Rough Transcript of Trial (July 25, 2023 AM) ("July 25 AM Trial Tr. (Rough)") at 49:16–50:6; *see also* July 24 PM Trial Tr. (Rough) at 61:8–64:3 (Lorena Algredo testifying that the cost of sending defendant's son to Boston University was approximately $80,000 per year). On direct examination, Ruiz argued that defendant's wealth could be explained by his taking advantage of the tax consequences of depreciating property and by the sudden increase in the value of his five properties due to "luck[]." July 25 AM Trial Tr. (Rough) at 19:23–23:18. On cross-examination, however, Ruiz admitted that he was unaware of defendant's Mexican bank accounts and real property, that no foreign properties are reported on defendant's tax returns, and that failure to report income from foreign properties amounts to "tax fraud." *Id.* at 54:9–55:13. He further confirmed that any information he had about defendant's Pro Chemie business, was based on defendant's representations since Ruiz examined no records when filing defendant's tax returns. *See id.* at 47:23–49:10.

The defense also called as a witness Martin Partida-Ceja, Contreras-Arceo's brother-in-law, who admitted to working for Contreras-Arceo for approximately seven years in Mexican labs that produced methamphetamine. *See id.* at 65:8–12, 65:21–66:21.[5] Partida-Ceja's testimony corroborated Contreras-Arceo's and Romo's in several important respects. He

---

[5]     In response to the Court's October 24, 2023 Minute Order, directing the government to confer with counsel for Partida-Ceja about whether Partida-Ceja's name may be unredacted from the trial transcript of the public portions of the morning session of July 25, 2023, *see* Min. Order (Oct. 24, 2023), Partida-Ceja requests that he "be referred to by pseudonym throughout the transcript and in any subsequent public filings," *see* Gov't's Resp. Min. Order at 1, ECF No. 136. While existing redactions in the transcript will not be altered at this stage, this opinion will not refer to Partida-Ceja by pseudonym, in light of the fact that he testified publicly at trial and the parties in their post-trial motions and the docket entries refer to this witness by name.

acknowledged, for example, that Contreras-Arceo sent him, his son, Romo, and Romo's brother to Men's ranch to work at a methamphetamine lab, and that Contreras-Arceo was in charge of placing orders for precursor chemicals through Pulido, and that Peteto would eventually pick up those chemicals for transport to the labs.  *See id.* at 74:22–75:3, 79:25–80:18, 83:22–84:5; *see also id.* at 72:25–73:1 (Partida-Ceja testifying that while he did not know for certain that the methamphetamine produced in these labs was going to the United States, he is "not stupid not to realize that it would probably come here").  Partida-Ceja's testimony also supported Contreras-Arceo's testimony about the cartel's sophistication and its efforts to silo its members.  He confirmed Contreras-Arceo's testimony that those working in labs often did not know the official names of the chemicals that they were working with and explained that Pulido would remove the labels on the drums of chemicals that arrived in the labs so that nobody would know or could trace where the chemicals came from.  *Id.* at 81:1–17.  He further testified that he, on occasion, joined Contreras-Arceo when he went to meet Pulido, but that whenever additional people came to speak with Contreras-Arceo and Pulido, Partida-Ceja would "never [be] present" because Pulido "would take great care not to get people together, not to mix people."  *Id.* at 85:25–86:18.  His descriptions, in addition, of Men's ranch, Men, and accidents that occurred in the lab were consistent with the testimony of Contreras-Arceo and Romo.  *See id.* at 75:22–76:9, 77:11–79:4.  Partida-Ceja, however, testified that he never met or worked in methamphetamine labs with defendant and met him for the first time in jail in the United States after both men were incarcerated.  *Id.* at 67:21–69:5, 70:6–10.

The defense's last witness was defendant himself, who described Pro Chemie as "a brokerage company" that did "not buy," "receive," or "sell" products and "just deal[t] with the paperwork" and "pa[id] the companies in China, India, and Europe" for chemicals destined for

Mexico, for orders taken by Carlos and Carlos's own chemical company, M.B. Barter & Trading.  *See* Rough Transcript of Trial (July 25, 2023 PM) ("July 25 PM Trial Tr. (Rough)") at 18:19–19:11.  Defendant acknowledged that he paid the invoices for bulk quantities of precursor chemicals exported from China to Mexico, and that he made millions of dollars of wire transfers to companies overseas using the Pro Chemie bank account.  *Id.* at 37:21–41:11.  The thrust of defendant's testimony, however, was that he did all of this at Carlos's order: the chemical shipments belonged to Carlos, who knew and arranged the sellers in China and buyers in Mexico, and the money in the Pro Chemie account belonged to Carlos.  *Id.* at 37:21–40:4. According to defendant, his only involvement was paying the invoices "when Carlos told [him] the name of the company and the invoice that needed to be paid."  *Id.* at 39:23–25; *see also id.* at 38:23–25.  He denied having ever met Contreras-Arceo, Pulido, or any member of a Mexican cartel.  *Id.* at 31:19–32:4. He claimed only to follow Carlos's orders.

During closing statements, the defense repeatedly urged the jury to believe Partida-Ceja, whose testimony, the defense argued, was inconsistent with Contreras-Arceo's on the presence of defendant at Men's ranch and thus undercut Contreras-Arceo's credibility.  *See* Rough Transcript of Trial (July 26, 2023) ("July 26 Trial Tr. (Rough)") at 35:25–38:20.  In its rebuttal, the government argued that the defense's focus on defendant's physical presence was a red herring.  *See id.* at 55:23–56:9.  "[N]o one said that the defendant was at Men's ranch, not [Partida-Ceja], not [Romo], and not [Contreras-Arceo]."  *Id.* at 55:23–56:1.  Rather, defendant, who was based in the United States, was the conspiracy's main connection to the United States, and thus he did not need to be in Mexico to do his job.  *See id.* at 55:12–22.

### C.      The Verdict and Post-Trial Motions

At the conclusion of all the evidence, defendant moved for a judgment of acquittal, which

was denied.  *See* Min. Entry (July 25, 2023) ("Oral motion by counsel for the defendant for

acquittal under Rule 29, heard and denied."); *see also* Fed. R. Crim. P. 29(a).  The next day, the

jury found defendant guilty on all counts.  *See* Min. Entry (July 26, 2023); *see also* Jury Verdict

Form, ECF No. 121.  On August 17, 2023, defendant filed the pending motions for acquittal

under Federal Rule of Criminal Procedure 29(c) or, alternatively, for a new trial under Rule

33(a).  Def.'s Mot. at 1.

Sentencing is currently scheduled for November 17, 2023.  *See* Min. Entry (July 26,

2023).  Defendant faces a mandatory minimum term of 10 years' imprisonment and a maximum

period of life on Count One.  *See* 21 U.S.C. §§ 959(a), 960(b)(1)(H).  He also faces a maximum

term of imprisonment of 20 years for each of Counts Two and Three.  *See* 18 U.S.C.

§ 1956(a)(2)(A); 21 U.S.C. §§ 595(b), 960(b)(7).

## II.      LEGAL STANDARD

### A.      Rule 29 Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29(c) permits a defendant to renew a motion for a

judgment of acquittal previously denied at the close of the government's case-in-chief or at the

close of all evidence.  Fed. R. Crim. P. 29(c).  In evaluating this post-verdict motion, a court

"must enter a judgment of acquittal of any offense for which the evidence is insufficient to

sustain a conviction."  Fed. R. Crim. P. 29(a).  The Supreme Court has emphasized that, in

evaluating the sufficiency of the evidence, "[t]he reviewing court considers only the 'legal'

question 'whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also United States v. Thompson*, 279 F.3d 1043, 1050–51 (D.C. Cir. 2002) ("In reviewing a conviction for sufficiency of the evidence, the court need only determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). A court must "view the evidence in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Williams*, 836 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted); *see also United States v. Singleton*, 702 F.2d 1159, 1163 (D.C. Cir. 1983) (articulating standard as "whether, viewing the evidence in the light most favorable to the Government, according the Government the benefit of all legitimate inferences, and recognizing that it is the jury's province to determine credibility and to weigh the evidence, a reasonable jury must necessarily entertain a reasonable doubt on the evidence presented" (emphasis omitted)).

The standard's purpose is to preserve "the factfinder's role as weigher of the evidence" and to respect "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Expressed more fully," the role of a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (citation omitted); *see also United States v. Bostick*, 791 F.3d 127, 137 (D.C. Cir. 2015) (explaining that "evidence need not exclude every reasonable hypothesis of innocence or be

wholly inconsistent with every conclusion except that of guilt" to sustain a guilty verdict

(citation omitted)).  In short, the standard for granting a motion for judgment of acquittal is "very

high," *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015), and "highly

deferential" to the jury verdict, *Williams*, 836 F.3d at 6.

> **B.      Rule 33 Motion for New Trial**

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion,

the court may vacate any judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a).  As indicated by the word "may" in Rule 33(a), "[t]rial courts enjoy broad

discretion in ruling on a motion for a new trial."  *United States v. Wheeler*, 753 F.3d 200, 208

(D.C. Cir. 2014); *see also United States v. Dale*, 991 F.2d 819, 838 (D.C. Cir. 1993) (explaining

that when "the court denies the new trial motion because the court's decision accords with the

jury's," any appellate "review of the district court's decision is particularly narrow"); *United

States v. Pettiford*, 517 F.3d 584, 591 (D.C. Cir. 2008) ("In reviewing the District Court's

decision on a new trial motion, [the D.C. Circuit] appl[ies] a deferential standard, and will

reverse only if the court abused its discretion or misapplied the law." (citation omitted)).  While

the rules do not define "interests of justice," the D.C. Circuit has instructed that "granting a new

trial motion is warranted only in those limited circumstances where 'a serious miscarriage of

justice may have occurred.'"  *Wheeler*, 753 F.3d at 208 (quoting *United States v. Rogers*, 918

F.2d 207, 213 (D.C. Cir. 1990)).  The defendant bears the burden of showing that a new trial is

justified.  *United States v. Reese*, 561 F.2d 894, 902 (D.C. Cir. 1977).

## III.      DISCUSSION

Defendant contends that he is entitled to a judgment of acquittal or a new trial due to the

insufficient evidence to support the jury's conclusion that he intended to further the conspiracy's

unlawful purpose; that is, that defendant intended to import into Mexico chemicals that would be used to produce methamphetamine for eventual distribution in the United States. *See* Def.'s Mot. at 1, 9–10; Def.'s Reply Supp. Mot. New Trial ("Def.'s Reply.") at 1, ECF No. 131. He raises no challenge to other elements of the charged offenses or any of the documentary evidence. He argues only that Contreras-Arceo's testimony, which, in his view, was the only evidence that linked the chemicals defendant imported into Mexico to the illegal production of methamphetamine, was "at best compromised, at worst, knowingly false" and thus insufficient to sustain his convictions. Def.'s Mot. at 9; *see also* Fed. R. Crim. P. 29(c); Govt.'s Opp'n Def.'s Mot. New Trial ("Govt.'s Opp'n") at 3, ECF No. 126 ("The only element of the three offenses of conviction that the Defendant alleges there is insufficient evidence to support is the Defendant's knowledge that the chemicals he was purchasing, via wire transfer between the United States and China, were being used to manufacture methamphetamine."). He further argues that Contreras-Arceo's testimony, coupled with the government's last-minute change in its theory of identification, and Bozenko's testimony that allegedly opined on the ultimate issue of fact, were a series of injustices that support the need for a new trial. *See* Def.'s Mot. at 9–11. As the Court explained orally at the close of trial and for the reasons below, these arguments fail to persuade.

### A.    Testimony of Jesus Contreras-Arceo

Defendant contends that Contreras-Arceo's testimony was "full of exaggerations and outright lies." *Id.* at 2. As support, he revives arguments that Contreras-Arceo lied when he testified that he never failed to identify defendant's brother Carlos and had never heard any of the government's audio recordings involving Carlos prior to trial. *See id.* at 2–4, 9–10. These same arguments were vigorously made at trial, plainly rejected by the jury, and certainly fare no

better under the more stringent standards applicable to a motion for acquittal and motion for a new trial.  They are addressed *seriatim* below.

Before turning to defendant's specific arguments about Contreras-Arceo, however, his claim that the government's case was "paltry" since Contreras-Arceo was the only witness who connected defendant to any illegal activity, *id.* at 1; *see also id.* at 9 (arguing that without Contreras-Arceo's testimony, none of the chemicals imported by defendant could be traced to an illegal methamphetamine lab), is a gross mischaracterization of the trial record and understates the other testimony elicited and the documentary evidence presented at trial.[6]  Business records, invoices, shipping documents, and emails and WhatsApp messages between defendant and Carlos undisputedly showed that defendant used his U.S.-based company, Pro Chemie, to export bulk quantities of chemicals from China to Mexico.  Specials Agent Novick and Owens, Partida-Ceja, the government's expert witness, Bozenko, and the defense's expert witness, Dr. Dudley, testified that these chemicals could be used to create methamphetamine.  While Dr. Dudley acknowledged that these chemicals had legitimate, legal uses, such as in a research lab, he conceded that labs stock only approximately "50 grams or a hundred grams," or at most "liters or

---

[6]    To the extent defendant contends that the government was required to provide direct evidence explicitly tracing the chemicals exported by defendant to the illegal methamphetamine labs, this argument has no merit.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *see also Holland v. United States*, 348 U.S. 121, 140 (1954) (observing that in criminal cases, circumstantial evidence is "intrinsically no different from testimonial evidence").  Any lack of direct evidence tracing the chemicals exported by defendant to the labs is particularly reasonable in this case, which concerns international drug trafficking by highly sophisticated cartels.  Contreras-Arceo testified, for example, that the cartel kept track of when certain chemicals became more heavily regulated and would change the primary chemical used to manufacture methamphetamine from time to time to evade law enforcement scrutiny.  July 18 AM Trial Tr. (Rough) at 10:2–13:3.  Partida-Ceja testified that Pulido would remove the labels on the drums of chemicals that arrived in the labs so that nobody would know where the chemicals came from, and that, as a result, those working in the laboratories often did not even know the official names of the chemicals they were working with.  *See* July 25 AM Trial Tr. (Rough) at 81:1–17.  Special Agent Miller testified that, as far as he knew, the DEA did not have the authority to put GPS trackers on the shipments of chemicals in Mexico, but that when law enforcement in Mexico put a GPS tracker on a shipment of chemicals imported by Carlos's company, the tracking "die[d]" mid-transport.  *See* July 20 AM Trial Tr. (Rough) at 66:21–67:15; July 20 PM Trial Tr. (Rough) at 46:25–47:17.

tens of liters," of these chemicals, a significant difference from the tonnage quantities transported by defendant.

Special Agents Novick, Miller, and Owens testified in detail about several large shipments of tonnage quantities of precursor chemicals on route from China to Mexico that were seized by the DEA, and that were directly linked to defendant using defendant's own emails, invoices, and shipping documents and the government's photos identifying transmittal information on the seized chemicals. Wiretap calls conducted by Mexican law enforcement revealed that Carlos knew that he and defendant were not running a legitimate chemical business. Special Agent Chang testified that defendant's own finances and unexplained wealth could not be squared with Pro Chemie's finances and defendant's other legal, reported sources of income, suggesting an additional source of unreported income. Defendant's wife acknowledged that defendant had bank accounts and owned real property, including a four-family building, in Mexico, which defendant's accountant Ruiz did not know about. In sum, confronted with this evidence, a jury, even without Contreras-Arceo's testimony, could reasonably have found that defendant knew that the tonnage quantities of precursor chemicals he purchased for importation into Mexico were being used to manufacture methamphetamine for foreseeable importation into the United States.

### 1.  *Identification of Carlos Algredo-Vazquez*

The parties agree that Contreras-Arceo was asked to identify defendant's brother, Carlos, over the course of two proffer sessions: in one session, he recognized Carlos after he was shown a sole photograph of Carlos and recalled details of his personal experiences with him; in the other session, Contreras-Arceo failed to identify Carlos when faced with a six-photograph array. *See* Min. Order (July 16, 2023). Defendant now argues that when defense counsel confronted

19

Contreras-Arceo about his inability to recognize Carlos in the six-photograph array, "Contreras-Arceo lied and testified that he had never failed to identify the defendant's brother."  Def.'s Mot. at 2; *see also* Def.'s Reply at 2.

The jury has the well-established right "to determine credibility, weigh the evidence and draw justifiable inferences of fact," *United States v. Battle*, 613 F.3d 258, 264 (D.C. Cir. 2010) (citation omitted), and a court must presume that "the jury has properly carried out [this] function[]," *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).  Consistent with the standard applied when evaluating the sufficiency of the evidence—*i.e.*, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Wright v. West*, 505 U.S. 277, 284 (1992) (emphasis omitted) (quoting *Jackson*, 443 U.S.  at 319)—defendant essentially asks this Court to conclude that no rational juror could have relied upon the challenged testimony. *Cf. Millar v. FCC*, 707 F.2d 1530, 1539 (D.C. Cir. 1983) ("[A] witness's testimony may be, under the circumstances of the case, so incredible, or contrary evidence may be so overwhelming, that demeanor could not convince a reasonable factfinder that the witness was telling the truth.").

Here, the jury was presented with dueling narratives from the parties.  The defense attempted to undermine Contreras-Arceo's credibility by confronting him, during cross-examination, with his inability "to pick out Carlos . . . from a group of six photos" during one of his proffer sessions and by arguing, in closing statements, that Contreras-Arceo was not to be believed.  *See* July 19 Trial Tr. (Rough) at 10:1–13 ("Q.  But what you don't remember is that one week before, on January the 27th, that you were unable to pick out Carlos Algredo from a group of six photos; correct?  A.  I remember that I always identified . . . Carlos. . . .  Q.  So you

don't remember not being able to identify Carlos. . . .  A.  I remember that I did identify him."); July 26 Trial Tr. (Rough) at 43:2–7 (defense counsel in summation, stating "[t]he only evidence at this trial to connect [defendant] to the meth conspiracy was the testimony of [Contreras-Arceo].  The government is asking you to believe him.  Despite the lack of any corroboration and his wild exaggerations and untruthful testimony").  The government, through its direct examination of DEA Special Agent Kevin Novick, explained that cooperating witnesses who fail to identify someone from displayed photographs are not told that they have failed; thus, being unaware of his failure to identify Carlos's photograph, Contreras-Arceo did not lie when testifying that he had not failed to identify Carlos at a proffer session.  *See* July 20 AM Trial Tr. (Rough) at 16:19–18:6.  Armed with these competing narratives, the jury could have reasonably concluded that Contreras-Arceo did not lie when he testified that he never failed to identify Carlos because he did not know that he had once failed to identify Carlos.

Defendant further argues that the government interfered with his attempts to impeach Contreras-Arceo in two ways.  Def.'s Mot. at 3–4.  First, he contends that the government belatedly told defense counsel that the six-photograph array produced in discovery to the defense was not the array presented to Contreras-Arceo at the proffer session, which prevented the defense from showing Contreras-Arceo the exact array he was previously shown.  *Id.* at 3.  The government, in response, asserts that the six photographs in the array were shown to Contreras-Arceo; they were simply shown to him one-by-one rather than in a simultaneous array due to COVID protocols requiring use of remote technology to show the photographs.  *See* Govt.'s Opp'n at 7; *see also* July 20 AM Trial Tr. (Rough) at 17:2–20.  This explanation, which was previously provided to defense counsel, is consistent with Agent Novick's testimony at trial about the procedures for photograph identification.  *See* July 20 AM Trial Tr. (Rough) at 16:19–

18:6.  In any case, nothing the government did prevented the defense from showing the witness the full array, and defendant offers no reason why showing Contreras-Arceo the photographs, which he had been presented on direct examination, during cross-examination would have aided his impeachment attempts.  *See* Def.'s Reply at 2 (offering no response to the government's questioning of "the possible 'impeachment' value of confronting the witness" (quoting Govt.'s Opp'n at 7)).  The parties did not—and do not—dispute that Contreras-Arceo once failed to identify Carlos, as the jury was advised; the issue was, instead, whether Contreras-Arceo lied when he said, based on what he knew, that he had never failed to identify Carlos.

Second, defendant argues that the government prevented the defense from impeaching Contreras-Arceo using the government's notes from its interview where Contreras-Arceo failed to identify Carlos by improperly "object[ing]" to the evidence, refusing to stipulate to the authenticity of the notes, and not making Special Agent Kyle Mori, who took the notes, "available as a defense witness."  Def.'s Mot. at 3–4; *see also* Def.'s Reply at 2.  These arguments have no merit.  As an initial matter, the defense never sought admission of the notes in court and thus the government never "object[ed]" to their introduction.  To the extent that defendant refers to out-of-court, informal conversations between the parties where the government questioned the admissibility of these notes, *see* Govt.'s Opp'n at 7, these conversations were not binding on the parties, and neither these conversations nor the government's refusal to stipulate to the authenticity or admissibility of the notes prevented the defense from attempting to use or admit the notes and allowing the Court to decide the issue of admissibility.  Finally, the government did nothing to make Agent Mori "[un]available"; rather, this Court expressed that if defendant requested a subpoena, the "subpoena will probably be issued."  July 24 AM Trial Tr. (Rough) at 8:7–12.  The defense never requested the subpoena or

otherwise attempted to call Agent Mori as a witness.  The government may be right that defendant "made a strategic decision not to call another Government agent, whose testimony may have done more harm than good to the defense theory."  Govt.'s Opp'n at 9.  In any case, as before, defendant offers no reason why these notes would have aided its impeachment attempts, given that the parties agreed to what the notes would have shown: that Contreras-Arceo once failed to identify Carlos.  Put differently, defendant raises no arguments that justify disturbing the jury's credibility determination with entry of a judgment of acquittal or indicate any serious miscarriage of justice occurred to justify a new trial.

### 2. *Testimony About the Government's Audio Recordings*

Defendant next argues that he was "unfair[ly] prejudice[d]" by Contreras-Arceo's false testimony that he had never heard any audio recordings involving Carlos prior to trial, and the government's decision to "simply let the perjurious testimony stand."  Def.'s Mot. at 10; *see also id.* at 4 (accusing the government of taking "no steps to correct and/or impeach what they knew was false testimony").[7]  Defendant blatantly mischaracterizes the record.[8]

During redirect examination of Contreras-Arceo, the government asked him about the audio recordings three times.  *See* July 19 Trial Tr. (Rough) at 39:13–19.  When Contreras-Arceo repeated twice that the government did not play the recordings for him and then said that he did not remember the recordings being played for him, the government reasonably moved on.  *Id.* When given the opportunity to later clarify the record, the government did so through the

---

[7]     The parties agree that some of the audio recordings played during Contreras-Arceo's testimony were also played for him during a pre-trial interview in preparation for trial.  *See* Def.'s Mot. at 3–4; Govt.'s Opp'n at 6.

[8]     Defendant, elsewhere, seems to acknowledge that the government did try to correct the record.  *See, e.g.*, Def.'s Mot. at 10 (acknowledging that the government questioned Contreras-Arceo about the audio recordings on re-direct); July 26 Trial Tr. (Rough) at 32:21–33:9 (stating, in closing statements, that "the prosecutor tried to prompt him" but Contreras-Arceo still would not "admit that he heard the tapes before").

testimony of Agent Novick, who was present when the recordings were played for Contreras-Arceo:

> Q: Again, you were here the entire time Mr. Contreras testified yesterday and the day before, correct?
> A: Yes.
> Q: And he testified, both on cross and during redirect, that he had never heard the recordings—the audio recordings that were played for him in court, that that was the first time he had ever heard those recordings. That's not accurate, is it?
> A: I can't speak to what he remembers or what he doesn't remember. I remember being at a proffer where recordings were played for him—or sorry—an interview where recordings were played for him; but what he remembers or not, I can't speak for him as far as that.

July 20 AM Trial Tr. (Rough) at 75:22–76:9.

The defense, in addition, repeatedly argued in closing statements that Contreras-Arceo was not to be believed. *See* July 26 Trial Tr. (Rough) at 32:21–24 ("When you deliberate, you should remember that Contreras was so dishonest on the witness stand in this case that he would not even admit to having listened to the audiotapes before he came to court."), 33:11–15 ("[T]here is not one shred of independent evidence to corroborate what Contreras said about Javier Algredo running a meth lab in Mexico."), 33:20–42:24 (arguing that "[a]ll that exists in the record of this trial is the word of a convicted felon who is facing a 35-year sentence," who, as the jury "know[s] from the evidence at trial," "has every motive to lie" and made "wild exaggerations and [gave] untruthful testimony"). That the jury, despite being presented with this testimony, this evidence, and these arguments, still chose to credit Contreras-Arceo's testimony that he knew defendant, bought precursor chemicals from him, and discussed with defendant the use of those precursor chemicals to manufacture methamphetamine for importation into the United States, is insufficient to require a judgment of acquittal or to order a new trial.

"Simply put, credibility judgments are the sole province of the jury," which "ultimately decided whom to believe, and how important this issue was to its verdict." *Radtke v. Lifecare*

*Mgmt. Partners*, 795 F.3d 159, 167 (D.C. Cir. 2015); *see also United States v. Anderson*, 498 F.2d 1038, 1039 n.1 (D.C. Cir. 1974) (affirming "trial court's refusal to grant a motion for judgment of acquittal" based on defendant's argument that "testimony of the complaining witness was 'inherently incredible,'" since "[t]he question of credibility was for the jury"). Defendant's attempts to again persuade this Court to supplant the jury's assessment of the credibility of Contreras-Arceo are rejected.

>    **B.      The Government's Theory of Identification**

On July 6, 2023, more than a month before trial, the government moved to strike the alias "Men" from the indictment, in light of new information that defendant did not go by the alias "Men" and in fear of "the potential to mislead the jury."  Govt.'s Mot. Strike Alias at 1, ECF No. 95.  The motion was denied as unnecessary, since the indictment would not be presented to the jury, and the charges against defendant would be provided to the jury as part of jury instructions using only defendant's full name.  *See* Min. Order (July 6, 2023).  Several days later, defendant stated, in briefing associated with a different motion, that he too "considered filing a motion to strike the alias in March of 2023," but because the government objected, "[t]he motion was never filed."  Def.'s Reply Supp. Mot. for Hr'g at 2 n.1, ECF No. 101-1.  Now, in an ironic turn of events, defendant, relying on *Berger v. United States*, 295 U.S. 78 (1935), argues that this "last-minute change" in the government's "theory of identification" was a "fatal variance" that warrants a new trial.  Def.'s Mot. at 11.  This argument fails to persuade.

In *Berger*, the Supreme Court explained that not every variance between the crime charged in the indictment and the crime proved at trial is "fatal" to the validity of the resulting conviction.  295 U.S. at 81.  The "true inquiry" is "not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the

accused." *Id.* at 82.  The purpose of the rule is, in part, to ensure that "the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial." *Id.*  The "proper standard of review" for such alleged variance is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict." *United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Here, any error from listing the alias "Men" in the indictment was minimal and did not affect defendant's "substantial rights."  The indictment charged defendant by his correct full name, and the witnesses, including Contreras-Arceo, identified him and referred to him in their testimony by his first or full name.  *See, e.g.*, July 18 AM Trial Tr. (Rough) at 15:17–16:2 (Contreras Arceo identifying defendant in court by describing his clothes), 19:15–19 (calling defendant "Javier"), 24:17–19 (explaining that he was introduced to defendant as "Javier" and not by "a nickname, or any other way").[9]  The documentary evidence, too, referred to defendant by name and not alias: business records listed defendant by his full name as the owner of Pro Chemie; emails requesting information and inquiring about the status of a shipment of bulk quantities of oxalic acid, a chemical commonly used to conceal methamphetamine after production for transport without detection, which shipment was seized by the DEA in Texas, were signed "Javi Vazquez ; emails between defendant and his brother discussing the coordination of payments for chemicals included his full name; and invoices for the sale of bulk quantities of chemicals included the name of his company, Pro Chemie.  The jury instructions,

---

[9]       In fact, Contreras-Arceo testified that Men is "Victor Mora," who helped Contreras-Arceo deliver, from Mexico to Texas, methamphetamine as payment to defendant on one occasion, and from whom defendant rented his methamphetamine lab.  *See* July 18 AM Trial Tr. (Rough) at 37:17–38:7; *see also id.* at 41:20–21 ("Q.  To clarify, are Javier and 'Men' different people?  A.  Yes.  That's correct."); July 19 Trial Tr. (Rough) at 25:14–26:4 (similar but on cross-examination).  In summation, the government "agree[d]" with the defense that Men and defendant "are two different people."  July 26 Trial Tr. (Rough) at 56:25–57:1.

too, refer to defendant by his full name without mention of the alias "Men." *See* Final Jury Instructions, ECF No. 117.  In short, any variance caused by listing the alias "Men" in the indictment was immaterial, not prejudicial, and certainly not "fatal."

Defendant's only argument with respect to prejudice is that he was deprived of the opportunity to argue that "another person named 'Men' worked at the methamphetamine laboratories" run by the cartel and to use "its planned cross-examination to establish that the defendant was not nicknamed 'Men.'" Def.'s Mot. at 11.  Put differently, defendant seems to argue that he was prejudiced by the fact that because the government did not falsely present evidence that defendant went by the alias "Men," he lost out on the opportunity to prove that he was not, in fact, "Men."  This argument gets nowhere.

At the outset, even though the government did not call to testify the only witness who identified defendant using the nickname "Men," the defense elicited testimony that suggested that the government once thought defendant was "Men."  Partida-Ceja, for example, testified:

Q.  Did anyone ever ask you if Mr. Algredo had the nickname 'Men'? . . .
A.  The prosecutors there asked me if he was Men.
Q.  And what did you tell them?
A.  No, that he was not Men.
Q.  And when you told the government that, did they seem unhappy with you?
A.  No.  Because, in fact, they don't believe me.

July 25 AM Trial Tr. (Rough) at 69:6–14.  The defense, in addition, if it truly wanted, could have called the one witness who identified defendant using the nickname "Men" and elicit from him testimony to this effect.  That the government did not, at trial, falsely pursue the theory that defendant used the alias "Men" is not an injustice that justifies a new trial.  That defendant is not "Men," in addition, does little to defend him against the conspiracy charges he faced and of which he has now been found guilty.

### C.    Joseph Bozenko's Expert Testimony

For the first time in his reply brief, defendant argues that the government's expert witness Joseph Bozenko "improperly invaded the jury's province" by "opin[ing] upon the ultimate issue of the defendant's intent," in violation of Federal Rule of Evidence 704(b).  Def.'s Reply at 1, 4; *see also* July 24 AM Trial Tr. (Rough) at 44:10–17 (the Court accepting Bozenko as an expert witness who "may testify and offer his opinions in this case" after defense counsel stated that "[t]here is no objection" to the government's tender of Bozenko "as an expert in the areas of the use of chemicals to produce and distribute drugs, clandestine drug laboratories, and the means and methods for producing methamphetamine and fentanyl").[10]  Defendant specifically takes issue with the following exchange:

> Q.  Based on your training, your experience, your education, and your review of the evidence in this case, are you able to reach an expert opinion as to what the chemicals being procured by the defendant were most likely used for?
> A.  From what I see and from what I have assessed here, . . . these substances were used to support the manufacturing of methamphetamine, fentanyl, and cocaine.

July 24 AM Trial Tr. (Rough) at 72:11–17.

Rule 704(b) provides that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone."  Fed. R. Evid. 704(b).  "[T]estimony should not be excluded under Rule 704(b) as long as it is clear that the expert is testifying on the basis of his knowledge or general criminal practices and not on some special knowledge of the defendant's mental processes."  *United States v. Bailey*, 319 F.3d 514, 521 (D.C. Cir. 2003).  To determine whether testimony should be excluded, courts consider "(1) the language used by the questioner and/or the expert, including

---

[10]    At trial, defense objected to Bozenko's testimony as it relates to fentanyl on relevance grounds, and the objection was overruled.  *See* July 24 AM Trial Tr. (Rough) at 37:8–22.

use of the actual word 'intent'; and (2) whether the context of the testimony makes clear to the jury that the opinion is based on knowledge of general criminal practices, rather than 'some special knowledge of the defendant's mental processes.'" *Id.* (citation omitted).

Even setting aside the fact that defendant did not object to this line of questioning at trial and failed to raise this objection in his motion for a new trial, *see United States v. Powers*, 885 F.3d 728, 732 (D.C. Cir. 2018) (explaining that a party "ordinarily must raise any issues ripe for [a court's] consideration in their opening briefs"), his argument has no merit.  Read in context, Bozenko's testimony did not suggest that he was speaking based on "special knowledge of the defendant's mental processes."  *Bailey*, 319 F.3d at 521.  Neither the government nor Bozenko used the actual word "intent."  Rather, the government's use of the language "most likely" makes clear that Bozenko was asked to offer his "opinion," based on "[his] training, [his] experience, [his] education, and [his] review of the evidence in this case," as to what the chemicals procured by defendant were used for.  Bozenko, in turn, qualified his answer with the clause "[f]rom what I see and from what I have assessed here," which refers to the context in which the question arose: the government had been asking Bozenko to review documents that listed the chemicals— and the huge quantity of such chemicals—procured by defendant and his co-conspirators, if he was familiar with the chemicals, and then to explain how these chemicals are generally used in the process of manufacturing and distributing drugs.  Understood in this more fulsome context, Bozenko's testimony did not offer an opinion on defendant's mental state or condition.  Put another way, Bozenko's testimony that the chemicals procured by defendant were "most likely" used "to support the manufacturing of methamphetamine, fentanyl, and cocaine" did not speak to defendant's actual intent when he procured the chemicals or imply that Bozenko had actual knowledge of how defendant used these chemicals.

### D. Defendant's Miscellaneous Alleged "Miscarriages of Justice"

Defendant identifies in passing several other instances he describes as "miscarriages of justice," Def.'s Mot. at 10, which are briefly addressed here for completeness.  First, he contends that "during its summation and rebuttal the Government referred to Contreras-Arceo as 'Canasto,' rather than by his actual name," which "might" have confused the jury.  *Id.* at 4 n.3.  Given that Contreras-Arceo stated at the beginning of his testimony that he goes by the nickname "Canasto," July 18 AM Trial Tr. (Rough) at 3:15–16, and other witnesses, including defense witnesses, confirmed that Contreras-Arceo goes by "Canasto," *see, e.g.*, July 25 AM Trial Tr. (Rough) at 65:8–16, defendant offers no reason why the jury might have been confused.

Second, defendant states that "[i]t was unclear to the defense prior to the trial why the government indicated an intention to call Tony Romo Reyes to testify in their case in chief" because Romo's "testimony added nothing to the Government's affirmative evidence."  Def.'s Mot. at 4–5.  Defendant's implication that Romo's testimony was irrelevant or cumulative is belied by his own motion to subpoena Romo to testify, which motion was granted.  *See* Def.'s Mot. Issuance of Subpoena, ECF No. 94; Order Granting Mot. Issuance of Subpoena, ECF No. 98.  In any case, Romo's testimony is clearly relevant to corroborate Contreras-Arceo's testimony in several important respects, such as by confirming the conditions of and day-to-day operations at Men's ranch, that Peteto was in charge of picking up the produced methamphetamine, that Contreras-Arceo sent some of his workers, including Romo, Romo's brother, Partida-Ceja, and Partida-Ceja's son, to work at the ranch, and that another group of individuals worked to manufacture methamphetamine in the same lab, but with whom Romo had little interaction.  *See* July 24 AM Trial Tr. (Rough) at 27:14–25, 29:8–15.

Third, defendant argues that Special Agent Chang's testimony about *casa de cambios*, a type of money exchange business that allows individuals to transfer cash in a way that is hard to trace, "caused improper [jury] confusion." Def.'s Mot. at 9 n.5.  The government asked Special Agent Chang several brief questions about *casa de cambios* in the context of her experience investigating money laundering, which defendant did not object to, and her investigative experience was plainly relevant to her later testimony about her investigation into Pro Chemie's engagement in international promotional money laundering. *See* July 20 PM Trial Tr. (Rough) at 106:12–107:9, 110:1–10.  Any confusion, in addition, was cleared up on cross-examination, during which the defense engaged in a longer series of questioning about *casa de cambios*, elicited testimony that *casa de cambios* can be legitimate businesses in Mexico, and clarified that transfers from Carlos's company, M.B. Barter & Trading, to defendant's company, Pro Chemie, were sent via Mexican banks, not *casa de cambios*. *See* July 21 Trial Tr. (Rough) at 34:15–38:7. In its closing statements, the government reiterated that *casa de cambios* are not "relevant to the money laundering charge in this case," which involves "a pretty simple form of money laundering."  July 26 Trial Tr. (Rough) at 23:24–24:25.

Finally, defendant argues that because the government initially anticipated that its case in chief would last for three weeks but only actually took five days, the defense "was left scrambling to coordinate the defense witnesses" and thus "put[] on a significantly weaker case than planned."  Def.'s Mot. at 11 n.6.  At the outset, the government gave defendant notice at the pre-trial conference that it anticipated that its case-in-chief would last seven days. *See* Govt.'s Opp'n at 10.  Then, because defendant agreed to stipulate to certain testimony, the government no longer needed to call four of its witnesses and immediately told defendant that its case would now last only five to six days. *See id.*  The government's case in chief ultimately lasted five

days.  Even setting these facts aside, the defense never made these objections on the record,

indicate that it needed more time to secure the arrival of its witnesses, or otherwise ask the Court

to intervene, such as by asking for a continuance.

## IV.    CONCLUSION

The testimonial and documentary evidence at trial demonstrated that defendant Javier

Algredo Vazquez, using his U.S.-based company Pro Chemie, assisted in procuring and

transporting from China to Mexico tonnage quantities of chemicals to support the manufacturing

of methamphetamine and conspired to commit money laundering.  None of defendant's

arguments justify disturbing the jury's verdict, convicting him of three counts: (1) conspiring,

between around 2011 until September 23, 2021, to manufacture and distribute 500 grams or

more of methamphetamine for unlawful importation into the United States, in violation of 21

U.S.C. §§ 959(a), 960, and 963; (2) conspiring, during the same period, to distribute

methylamine for unlawful importation into the United States, in violation of 21 U.S.C.

§§ 959(b), 960, and 963; and (3) conspiring, from around 2018 to September 23, 2021, to

launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(2)(A), (h).

Accordingly, for the foregoing reasons, defendant Javier Algredo Vazquez's Motion for

Motion for New Trial, ECF No. 124, and Renewed Motion for Judgment of Acquittal, ECF No.

125, are **DENIED**.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date:    October 30, 2023

_____

**BERYL A. HOWELL**
United States District Judge

32