UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. 21-CR-597 (BAH) |
| | : | |
| v. | : | |
| | : | |
| JAVIER ALGREDO VAZQUEZ, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States respectfully submits this Sentencing Memorandum in the case of Defendant Javier Algredo Vazquez ("Defendant"). The Defendant was found guilty by a jury on July 26, 2023, of conspiracy to manufacture and distribute 500 grams or more of methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963; conspiracy to distribute a listed chemical to manufacture methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(b), 960, and 963; and conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and (h). Dkt. No. 121. Based on the evidence introduced at trial, the Government respectfully recommends a sentence, within the Guidelines range, of 35 years' imprisonment to reflect the nature, circumstances, and seriousness of the Defendant's unlawful conduct.

I.  **Factual Background**

   a. **Procedural History**

On September 20, 2021, the Defendant was arrested in the District of Columbia on an arrest warrant based on information contained in a criminal complaint filed on September 20, 2021. Dkt. No. 2. On September 23, 2021, the Defendant was charged in a three-count Indictment with conspiracy to manufacture and distribute 500 grams or more of methamphetamine for importation

into the United States, in violation of 21 U.S.C. §§ 959(a), 960, and 963 (Count One); conspiracy to distribute a listed chemical to manufacture methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(b), 960, and 963 (Count Two); and conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and (h) (Count Three). Dkt. No. 8. After a one-and-a-half-week trial, on July 26, 2023, a jury found the Defendant guilty on all counts. Dkt. No. 121.

### a. Evidence Introduced at Trial

At trial, the Government introduced evidence that the Defendant ran a chemical company named Pro Chemie New York, based in Elmhurst, New York, to purchase chemicals from China, India, and elsewhere for importation into Mexico, where they were used by a Mexican drug trafficking organization ("DTO"), the Cartel de Jalisco Nueva Generacion ("CJNG"), to manufacture and process methamphetamine, fentanyl, and other drugs. Transcript Day 2 PM, July 19, 2023 at 76–77 ("Tran. Day 2 PM"); Gov. Exs. 35–36; Transcript Day 3 AM, July 20, 2023 at 43 ("Tran. Day 3 AM"); Gov. Ex. 132; Transcript Day 5 AM, July 24, 2023 at 72 ("Tran. Day 5 AM"); Transcript Day 3 PM, July 20, 2023 at 12–13 ("Tran. Day 3 PM"); Gov. Ex. 191. Evidence at trial also showed that the Defendant worked closely with his brother Carlos Algredo Vazquez ("Carlos"), who owned a chemical company in Mexico named MB Barter & Trading. *See* Gov. Exs. 37A, 38A, and 39A; Tran. Day 2 PM at 80-84; Transcript Day 6 PM, July 25, 2023, at 36–37 ("Tran. Day 6 PM").

Between 2018 and 2021, the Defendant and his brother supplied Mexican DTOs with more than 1,453,000 kilograms of precursor chemicals used to manufacture methamphetamine, including methylamine, benzyl alcohol, and n-methyl formamide, as well as 44,150 kilograms of precursor chemicals used to manufacture fentanyl, including propionyl chloride, 4-piperidone

hydrochloride monohydrate, and acetic acid. Gov. Exs. 39A, 132; Tran. Day 5 AM at 50–57 and 64–66. But the Defendant and his brother did not only provide the DTOs with the precursor chemicals they needed to manufacture methamphetamine and fentanyl, they also provided the DTOs with more than 1,848,000 kilograms of the chemicals they needed to make that methamphetamine more potent—tartaric acid, 2,2-azobisisobutyronitrile ("AIBN"), and methyl thioglycolate. Gov. Ex. 132; Day 5 AM at 57–59. This allowed the DTOs to double their yield from the production of methamphetamine. Tran. Day 5 AM at 59.

DEA expert chemist Joseph Bozenko testified that the methylamine procured by the Defendant and his brother during this three-year period would produce approximately 106,000 kilograms of methamphetamine in Mexican methamphetamine laboratories.[1] Tran. Day 5 AM at 69. The propionyl chloride the Defendant and his brother imported into Mexico could produce 4,480 kilograms of fentanyl or more than 2.2 billion doses of fentanyl. *Id*. at 70–72. Additionally, the Defendant and his brother provided the DTOs with chemicals that are used to adulterate and conceal cocaine shipments. *Id*. at 67–68.

But the Defendant's involvement in the conspiracy started long before 2018. Jesus Contreras Arceo ("Contreras") testified that he began doing business with the Defendant and his brother and co-conspirator Carlos in 2010. Tran. Day 1 AM at 15–17. Contreras was a member of the CJNG who was responsible for managing methamphetamine laboratories for the CJNG's leader, Nemesio Oseguera Cervantes, also known as Mencho, from 2009 until his arrest in 2018. *Id*. at 6. Contreras oversaw eight to ten laboratories at a time in Jalisco, Mexico, and each produced

---

[1] This estimate was based on the 106,000 kilograms of methylamine that was procured by the Defendant based on invoices in his e-mail account. Gov. Ex. 132. This estimate did not include the 24,500 kilograms of methylamine that was seized by the DEA in Oakland, California, on its way to Carlos in Mexico or the methylamine that the Defendant sold to Jesus Contreras Arceo before 2018. Transcript Day 1 AM, July 18, 2023 at 21–23 ("Tran. Day 1 AM").

approximately 200 kilograms of methamphetamine per month, which was exported to the United States. *Id*. at 8. Contreras was responsible for ordering all of the chemicals that were needed for the labs. *Id*. at 15. Francisco Pulido Coracero ("Pulido"), Carlos, and the Defendant supplied Contreras and the CJNG with the chemicals to produce the methamphetamine, including methylamine. *Id.* at 18–22. Specifically, Contreras testified that on two occasions between 2010 and 2013, the Defendant supplied him with 32 and 28 barrels of methylamine, which were used to produce 1,200 kilograms of methamphetamine. *Id*. at 21–23. The Defendant also supplied Contreras with two shipping containers of methylamine, each containing 80 barrels, in 2017. *Id*. at 29–30.

Purchasing these chemicals for the DTOs required the Defendant to move large sums of money between Mexico, the United States, and China. Between 2018 and 2021, the Defendant used the Pro Chemie New York Bank of America account ending in 7754, to which he was the sole signatory, to receive $9,084,434 in wire transfers from companies in Mexico and to send $8,661,675 in wire transfers to chemical companies located in China, in order to purchase the chemicals. Tran. Day 3 PM at 111, 113–14. Financial analysis showed that the bank account ending in 7754 was used only to send and receive wire transfers to purchase chemicals, and there were no business expenses and minimal operational expenses paid by the account. Transcript Day 4 PM, July 21, 2023 at 13 ("Tran. Day 4 PM").

Finally, the Government also introduced evidence at trial that the Defendant was paid for chemicals he supplied to Contreras with 14 to 20 kilograms of methamphetamine, which the Defendant planned to send to Texas. Tran. Day 1 AM at 36–38. The Defendant also invested directly in the production of methamphetamine and received 200 kilograms of the methamphetamine that was produced. *Id*. at 40.

4

## II.     The Presentence Investigation Report

On October 11, 2023, the U.S. Probation Office issued a final Presentence Investigation Report ("PSR") for the Defendant. The Probation Office determined that Counts One, Two, and Three are grouped for guideline calculation purposes, pursuant to U.S.S.G. §§ 3D1.2(c) and 2S1.1. PSR ¶ 29. Based on the quantity of methamphetamine for which the Defendant is accountable, the Probation Office determined the Defendant's Base Offense Level to be 38 pursuant to U.S.S.G. § 2D1.1. PSR ¶ 32. The Probation Office also found that because the offense committed by the Defendant involved the importation of methamphetamine, a two-level increase was applicable under U.S.S.G. § 2D1.1(b)(5). PSR ¶ 32. The Probation Office found that because the Defendant was convicted of a violation of 18 U.S.C. § 1956, a two-level increase was applicable under U.S.S.G. § 2S1.1(b)(2)(B). PSR ¶ 33.

Ultimately, the Probation Office calculated the Defendant's Total Offense Level following the application of all enhancements and reductions to be a level 42. PSR ¶ 40. Because the Defendant lacks a criminal history in the United States, the Probation Office determined that the Defendant was in Criminal History Category I. PSR ¶ 43. This results in an applicable Guidelines range of 360 months to life. PSR ¶ 82.

The Government does not object to the Probation Office's Guidelines calculation. However, the Government believes that the evidence that should be relied on in determining a sentence is the evidence that was admitted at trial and not the evidence in PSR ¶¶ 7–15.

**III.     Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)**

The Sentencing Guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220, 258–60 (2005). However, the Supreme Court held in *Booker* that sentencing courts must consider the Guidelines in formulating an appropriate sentence. *Id.* In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of *Booker*:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

*Gall*, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." *Id.* at 49–50 (citation and footnote omitted).

In determining the appropriate sentence, the statute directs courts to consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Further, courts are also directed to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.   The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

      a. <u>Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense</u>

The Defendant committed a serious crime against the United States, having been convicted of conspiring to manufacture methamphetamine for importation into the United States, conspiring to distribute a listed chemical to manufacture methamphetamine for importation into the United States, and conspiring to launder monetary instruments.  In 2021—the year the Defendant was arrested and charged—106,000 people in the United States died from drug-involved overdoses. *See* National Institute on Drug Abuse, "Drug Overdose Death Rates," https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (last accessed Oct. 24, 2023).  More than 70,000 of those overdose deaths involved synthetic opioids, primarily fentanyl, and more than 32,000 involved psychostimulants, primarily methamphetamine. *Id*.

7

The Defendant provided dangerous Mexican DTOs with millions of kilograms of chemicals to manufacture and produce tonnage quantities of methamphetamine and fentanyl for more than a decade. Even setting aside the methamphetamine that the Defendant personally planned to import into the United States, the Defendant was responsible for enabling the production of staggering quantities of deadly drugs. For example, the Defendant procured enough methylamine for Mexican DTOs to produce more than 106,000 kilograms of methamphetamine. Tran. Day 5 AM at 69. And the fentanyl produced from just one of the chemicals supplied by the Defendant, propionyl chloride, was enough for 2.2 billion potentially lethal doses of fentanyl. *See* Drug Enforcement Administration, "Facts About Fentanyl," https://www.dea.gov/resources/facts-about-fentanyl (last accessed Oct. 23, 2023).

The Defendant has not taken responsibility for his actions or expressed any remorse. At trial he testified and maintained that he acted only as a broker for chemical shipments that were arranged by his brother Carlos. Tran. Day 6 PM at 18–19. The Defendant said he "never" checked to see who the Mexican company purchasing the chemicals was, he "never" researched the types of chemicals being ordered or what they were used for, and he did not know if any of the chemicals he imported into Mexico were prohibited. *Id*. at 25–26. Yet the Defendant's own emails and bank records show how implausible his purported ignorance was—he paid for hundreds of different shipments of chemicals to be imported into Mexico, totaling more than 5,000,000 kilograms of chemicals. Gov. Exs. 132 and 191. These hundreds of chemical shipments the Defendant was brokering were not small shipments, but shipping containers full of chemicals, which cost tens to hundreds of thousands of dollars. *See, e.g.,* Gov. Exs. 83–97, 98–108, 109–117, 119–128, 238. In just three years, the Defendant used his company Pro Chemie New York to purchase more than $8.5 million worth of chemicals. Tran. Day 3 PM at 113–14. The Defendant even received an

email from his brother with the subject line "Prohibited product in the USA" and methylamine invoices attached to it.  Gov. Ex. 118B.

The Defendant's finances are also at odds with his version of events.  The Defendant admitted that Pro Chemie New York charged its customers in Mexico three to five percent of the value of the $8.5 million in invoices.  Tran. Day 6 PM at 43–44.  Yet, according to the Defendant, his company never made more than $3,867 a year after expenses—even though it had no office space and no staff.  *Id*. at 49–50, 35.  Meanwhile, the most the Defendant ever claimed in wages from his job at the Hyatt was $87,000 a year.  *Id*. at 45.  But somehow, the Defendant could afford to own not only his home, but also four rental properties in the New York (three of which are paid off) and two rental properties in Mexico (one of which was being rented to the Government of Mexico), and he could afford to send his son to Boston University at a cost of $84,000 a year—paying at least the first semester bill out of pocket.  *Id*. at 44–48.

The severity of the crime committed by the Defendant, and his utter lack of remorse, warrants a Guidelines sentence of 35 years' imprisonment.

      b.  <u>History and Characteristics of the Defendant</u>

The Defendant has no known criminal convictions.  He is a citizen of the United States.  Prior to his arrest, the Defendant maintained steady legitimate employment.  However, the Defendant was also involved in the conspiracy to provide chemicals to DTOs to manufacture methamphetamine for more than a decade, and he ran an illegitimate chemical company for more than five years.

      c.  <u>Adequate Deterrence</u>

Given the adverse impact that drug trafficking has on society and the serious detrimental effects of methamphetamine and fentanyl in communities in the United States and abroad, it is

important that the Court impose a sentence that deters others from undermining the rule of law. The manufacturing of synthetic drugs in Mexico and their importation into the United States still occurs in large quantities. As Special Agent Kevin Novick testified at trial, most of the methamphetamine and fentanyl sold on the black market in the United States is manufactured in Mexico. Tran. Day 2 PM at 73. In 2022, Customs and Border Protection seized 160,000 kilograms of methamphetamine and 14,100 kilograms of fentanyl along the Southwest border. U.S. Customs and Border Protection, "Drug Seizure Statistics," https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last accessed Oct. 24, 2023). This methamphetamine and fentanyl cannot be manufactured in Mexico without the chemicals that the DTOs are importing from China and elsewhere. A sentence of 35 years' imprisonment provides critical general deterrence to other individuals who are supplying the DTOs with the chemicals that they need to produce these drugs and shows that their participation in narcotics importation into the United States will result in substantial prison sentences.

Additionally, the Defendant willingly participated in a conspiracy to import huge quantities of chemicals into Mexico to produce tonnage quantities of drugs for more than a decade. The length and his willingness to support Mexican DTOs in their production of drugs in exchange for his own personal gain establishes a need to deter him from engaging in similar conduct in the future.

    d. <u>Need for Sentence Imposed to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants</u>

Section 3553(a)(6) articulates "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6) (emphasis added). When determining whether a sentence creates an unwarranted disparity, the Court should consider a defendant's acceptance of responsibility, the nature and

10

extent of a defendant's participation in the criminal activity, a defendant's criminal history and whether and to what extent a defendant cooperated. *See, e.g.*, *United States v. Mejia*, 597 F. 3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity resulting from defendant's "harsher" sentence was not unwarranted). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to his case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

To date, the Defendant's co-conspirators, who also procured chemicals for the DTOs—Carlos and Pulido—have not been extradited, tried, or sentenced for their participation in the conspiracy. Contreras—who testified at trial—was sentenced to 35 years for his participation in the conspiracy, and although his offense conduct involved violence, unlike the Defendant, he pled guilty and agreed to cooperate with the Government. Tran. Day 1 AM at 4.

With regards to defendants in unrelated cases, 18 U.S.C § 3553(a) does not require that the sentencing judge engage in a case-by-case comparison. This sentencing provision is aimed at national disparities; and courts have held that "the guidelines themselves are almost certainly the best indication of ordinary practice since most sentences are within the guidelines." *United States v. Saez*, 444 F.3d 15, 18–19 (1st Cir. 2006); *see also United States v. Boscarino,* 437 F.3d 634, 638 (7th Cir. 2006); *United States v. Gallegos,* 129 F.3d 1140, 1143 (10th Cir. 1997); *United States v. Hall,* 977 F.2d 861, 86–64 & n. 4 (4th Cir. 1992); *United States v. LaSalle,* 948 F.2d 215, 218 (6th Cir. 1991); *United States v. Joyner,* 924 F.2d 454, 460–61 (2d Cir. 1991). Furthermore, the Government could not identify any other sentenced defendants who supplied millions of kilograms of chemicals to DTOs to produce tonnage quantities of methamphetamine and fentanyl, and who not only went to trial but also testified and showed no remorse for their conduct. However, the

Government has identified several cases in which defendants had similar Guidelines ranges for conspiracy to distribute a controlled substance and received sentences comparable to the sentence recommended by the Government, even though their roles in their charged offenses were different than the Defendant's role.

In *United States v. Rivera-Mendoza*, the defendant pled guilty to a conspiracy to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841 and 846.  No. 10-CR-425 (S.D. Iowa), Dkt. No. 285.  Rivera-Mendoza was responsible for distributing or attempting to distribute approximately 20 kilograms of methamphetamine.  Sentencing Hr'g Tr., No. 10-CR-90 (N.D. Iowa), Dkt. No. 512 at 79.  The court calculated the base offense level as 38, and enhanced the sentence two levels for importation of the drugs from Mexico into the United States and three levels for a managerial role, resulting in an offense level of 43 and a criminal history category of I. *Id*. at 71. The court declined to grant the three-level acceptance of responsibility of reduction, despite the plea, because Rivera-Mendoza challenged the factual basis for the importation enhancement, resulting in a guidelines range of life.  *Id*. at 77.  The court sentenced Rivera-Mendoza to 420 months' imprisonment.  *Id*. at 86.

In *United States v. Knowles*, the defendant was convicted at trial for conspiracy to import five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. §§ 952 and 963, and possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841 and 846.  390 F. App'x 915, 916–17 (11th Cir. 2010).  Knowles' involvement in the conspiracy lasted from the mid-1980s through 2001, and he was responsible for distributing or attempting to distribute thousands of kilograms of cocaine.  *Id*. at 919–26.  Knowles' base offense level was 38, and he received a four-level enhancement for leadership, for a total offense level of 42 and a criminal history category of I, resulting in a guidelines range of 360 months to life.  *Id*.

at 927. The court imposed a sentence of 420 months' imprisonment.

For these reasons, a sentence of 35 years' imprisonment for the Defendant would not create an unwarranted sentencing disparity with other defendants.

**IV.    Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a Guideline range sentence of 35 years' imprisonment, which is reasonable, appropriate, and matches the severity of the crime committed by the Defendant. A sentence of 35 years' imprisonment is sufficient, but not greater than necessary, to hold the Defendant accountable for his crimes, promote respect for the law, deter the Defendant and others from committing similar serious crimes, and protect the public.

Respectfully Submitted,
MARLON COBAR
Chief
Narcotic and Dangerous Drug Section
U.S. Department of Justice

By:    */s/ Kate Naseef*
Kate Naseef
Nhan Nguyen
Kaitlin Sahni
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division, U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 514-0917

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing was sent via the Electronic Case Filing (ECF) system with the United States District Court for the District of Columbia to counsel of record for the Defendant, this 2nd day of November, 2023.

                                        By:     /s/ *Kate Naseef*
                                                    Kate Naseef
                                                    Trial Attorney
                                                    Narcotic and Dangerous Drug Section
                                                    Criminal Division
                                                    U.S. Department of Justice